[Civ. No. 40112. First Dist., Div. One. June 7, 1978.]

MAX FRIEDMAN et al., Plaintiffs and Respondents, v.
CITY OF FAIRFAX, Defendant and Appellant.

**COUNSEL**

Wallace S. Myers, City Attorney, for Defendant and Appellant.

Evelle J. Younger, Attorney General, E. Clement Shute, Jr., Assistant Attorney General, and Marc B. Hihaly, Deputy Attorney General, as Amici Curiae on behalf of Defendant and Appellant.

Freitas, Allen, McCarthy, Bettini & MacMahon and Bryan R. McCarthy for Plaintiffs and Respondents.

**OPINION**

RACANELLI, P. J.—Defendant City of Fairfax, a general law city (hereafter City), appeals from a judgment entered following a bifurcated trial awarding respondents $1.2 million damages as just compensation for the inverse condemnation of their property, attorney fees in the sum of $115,000 and costs. On appeal, City contends that the material findings do not support the judgment of inverse condemnation and are unsupported by the evidence. Our review of the record, in light of governing principles, compels the conclusion that the City's contention is well founded and dispositive of this appeal. Accordingly, we reverse the judgment.

The appeal focuses upon a classic example of competing interests in regulating land use: the interest of a small suburban city in preserving

open-space land through the exercise of its sovereign police powers conflicting with the interest of ownership in maximizing the profitable use of private property.[1]

## Background

We trace the factual and procedural history in light of the evidence relevant to our discussion:

The subject property, a registered California historical landmark commemorating the original homesite of the distinguished early settler, Lord Charles Fairfax, is located wholly within the boundaries of the City. It consists of two adjoining parcels approximately 23½ acres in size and several lots comprising an additional 1½ acres. During the earlier decades of the century, it was utilized for a variety of business purposes, including a restaurant establishment, a recreational facility for employees of a major retail store, and briefly as a school for boys. In 1941, respondents (hereinafter Friedman)[2] acquired the property then zoned for commercial use; that classification permitted—inter alia—commercial recreational facilities as a principal use and multiple residential dwellings as a conditional use. The property abutted land areas zoned for highway commercial, single-family and multiple-family residential uses. At the time of acquisition, the property contained a number of improvements including a clubhouse, swimming pool, employees' dormitories, tennis courts, and bleachers. Thereafter Friedman made several additional and remodeling improvements, including added swimming pools, restaurant buildings, a dance pavilion, summer cottage apartments, fully equipped picnic areas and related auxiliary facilities. From 1941 through mid-1972, Friedman conducted a commercial recreational enterprise on the property under the style of Marin Town & Country Club, open to the general public upon payment of an admission fee. At the conclusion of the 1972 summer season, Friedman terminated general business operations for economic reasons; the rental units continued to be leased producing an average monthly revenue of $5,000.

---

[1]City's appeal is supported by 32 other California cities appearing as amici curiae, represented by the Attorney General.

[2]In 1959, Friedman conveyed one of the two parcels to Marin Town & Country Club, Inc., a wholly owned corporation. However, he continued to treat the property as a single unit of ownership. Since the interests of respondents on appeal are identical, we shall refer to both collectively—for convenience—as Friedman.

As early as 1964, the City expressed interest in acquiring the property for preservation and use as a public park; however, no formal action was ever authorized or undertaken. In January 1968, the City adopted a general plan (see Gov. Code, § 65300 et seq.) which designated the property for its then existing commercial-recreational use. Thereafter, the City undertook a comprehensive rezoning study of the entire City and conducted a number of public hearings extending through early 1973 concerning the proposed adoption of ordinance No. 352, a city-wide zoning ordinance. The ordinance, consistent with the general plan, provided for rezoning of the subject property for private commercial-recreational (CR) use.[3] The future use of the property soon became the subject of considerable public interest and discussion. In August 1970, a member of the planning commission voiced an opinion that the property be retained as a public recreational area. In May 1971, the city council directed an inquiry whether the county planned to acquire the property; a negative reply was received. During a city council meeting in July 1971, a number of possible methods to fund public acquisition were discussed; a motion requesting the aid of the county and a neighboring city to preserve the site for recreational purposes was made and tabled. In the following month, the city council directed its administrator to investigate the availability of federal funds for purpose of acquisition and to develop a cost analysis of the property's utility as a recreational area.

[3]Article 39, ordinance No. 352 (applicable to the Friedman property alone) provided in relevant part as follows:

"*Sec. 39.00 Purpose*

"39.01 The CR, Commercial Recreation Zone, provides a location *for private, as opposed to publicly owned or operated, recreation facilities.* Such facilities may be single purpose and occupy large land areas as in the case of a golf course or country club; they may also consist of a complex of associated activities such as an amusement arcade or carnival, or a resort hotel. The uses in the zone tend toward physical activity in the open, and consequently adequate land area, careful design of improvements, and control of the type and location of activities are necessary to protect surrounding properties.

"*Sec. 39.02 General*

"(1) No premises in the CR, Commercial Recreation Zone may be used for any purpose or in any manner except as set forth in this Article. . . .

"*Sec. 39.10 Principal Permitted Uses and Structures*

"39.11 When conducted on a building site of not less than 10 acres:

"(1) *Private recreation clubs,* including boat, swim, fishing, golf, *tennis,* riding and country clubs.

"(2) Other uses determined by the Planning Commission to be of a similar nature to those listed in paragraph (1) of this section, and which comply with the objectives, purposes, policies, and standards of the Fairfax Area General Plan.

"(3) All other commercial recreational uses and structures specifically approved by the Planning Commission as part of a development plan or master plan approved by the Commission.

"(4) Public recreation facilities and structures approved by the City Council after referral of such proposals to the City Planning Commission and the City Parks and

Meanwhile, during the same period (1971), it was revealed that Friedman had entered into an agreement to sell the property for proposed development of several hundred units of multiple residential dwellings. The disclosure generated intense public discussion resulting in the formation of a citizens' organization called "Protect Land and Nature" (PLAN) whose principal objective was to resist the proposed development through circulating petitions urging the city council to adopt the proposed ordinance. Eventually, the momentum of citizen support concentrated on a successful effort to qualify an initiative measure rezoning the subject property as commercial-recreational (CR) in exactly the same manner and language as proposed under ordinance No. 352 (art. 39).[4] That measure was adopted at the general municipal election held on April 11, 1972. Notwithstanding, city officials continued with public hearings on ordinance No. 352 as a result of uncertainty concerning the validity of the initiative rezoning ordinance. Friedman promptly instituted litigation successfully challenging the validity of the initiative ordinance under the then existing law; on appeal, summary judgment in favor of Friedman was ultimately reversed and the initiative ordinance declared valid.[5]

Upon enactment of ordinance No. 352 on February 13, 1973, Friedman initiated the instant litigation seeking damages for inverse condemnation resulting from passage of the ordinance, a declaration that the ordinance was constitutionally invalid, and for other relief. The trial court made extensive findings of fact (discussed *infra*) in support of its

Recreation Commission.

"*Sec. 39.20 Conditional Uses and Structures*

"39.21 Such uses may not be established, expanded, substantially motified, or changed to another conditional use unless and until a Use Permit is obtained:

"(1) Any principal permitted use or structure on a building site of less than 10 acres.

"(2) Any commercial or residential use or structure which is determined by the Planning Commission to be accessory and incidental to an *allowed principal recreational use*, . . ." (Italics added.)

[4] In the petition for rehearing of decision referred to in the footnote following, Friedman conceded that the relevant language and content of both ordinances was substantially similar.

[5] In an unpublished opinion (*Friedman* v. *City of Fairfax,* 1 Civ. 33519) filed February 8, 1977 (hg. den. Apr. 8, 1977), we determined that under the recent decision of *Associated Home Builders* v. *City of Livermore* (1976) 18 Cal.3d 582 [135 Cal.Rptr. 41, 557 P.2d 473] (disapproving an earlier line of authorities), electors in a general law city were empowered, through exercise of the right of initiative reserved to the people under the state Constitution (art. IV, § 25, renumbered art. II, § 11 (1976)), to enact zoning ordinances without compliance with statutory notice and hearing requirements. (See Gov. Code, §§ 65853-65857.) The issue of inverse condemnation was neither pleaded nor raised in the trial of the underlying action.

judgment that the property had been inversely condemned for public use by enactment of ordinance No. 352, and following a court trial on the issue of damages, fixed damages in the amount stated as just compensation for the property and improvements thus "taken." During this phase of trial, uncontroverted evidence established that a portion of the property could be successfully operated as a tennis club, a currently popular recreational use expressly permitted under the CR zone and acknowledged by the trial court in its notice of intended decision. While the evidence of fair market value of the property both before and after rezoning varied considerably, the evidence most favorable to Friedman (established through testimony of a valuation expert called by Friedman) reflected a "before" fair market value of $1,250,000 diminished to a value of $250,000 in its rezoned condition.[6]

We first review the posture of the pleadings and the questioned findings.

### The Pleadings

Plaintiff's second amended complaint imprecisely pleaded several theories of relief, namely: (1) inverse condemnation (count I) and (2) a declaration of invalidity of the zoning ordinance as inconsistent with the general plan (count II), improper "spot zoning" (count III), and an abuse of discretion in failing to proceed as required by law (count V); the fourth count, repleading the substantive allegations of count I, sought relief in the form of multiple family residential zoning. After its general and special demurrers were overruled, City filed its answer which (in addition to general denials) specially pleaded a failure to state a cause of action, the long-standing commercial-recreational use of the property and its unique suitability for such continued use.

### Findings and Conclusions

At the conclusion of the first phase of trial, the trial court made numerous although somewhat repetitious findings which may be conveniently summarized as follows: *Past use:* Since acquiring the property in 1941, Friedman (as sole beneficial user) successfully operated the commercially zoned property as a single unit devoted to mixed commercial-recreational uses. In 1967, the commercial-recreational use

---

[6]Other evidence of value based upon projected income derived from the continued use of six acres devoted to vacation-apartment rentals reflected a fair market value of $650,000.

had become generally unprofitable and, in 1972, was discontinued as no longer economically feasible. The 1973 comprehensive rezoning ordinance expressly permitted similar commercial recreational activities; *Beneficial use:* The newly created CR zoning is not "economically feasible" and precluded *any* "reasonably viable economic use" of the property in any manner "consistent with its value," leaving Friedman with "no choice" except to leave the property in its present condition until its eventual public acquisition. *Taking for public use:* Through the combined actions and statements of city officials and citizens extending over several years, an intention was manifested to prevent "any [other] development" of the property, whose acquisition was sought as an integral part of an open-space program demonstrated by official efforts to obtain necessary purchase funds from federal and local public entities and "to explore" methods of acquisition. The City had a "settled policy" to preserve the open-space condition of the property, culminating in the adoption of the ordinance. By reason of the enactment of such ordinance, the public purpose was accomplished and constituted or "amounted to" an uncompensated "taking" of a fee interest for public use in inverse condemnation. Further, the City had never adopted a resolution of intention to condemn the property. (The court expressly declined to make any finding whether the ordinance was consistent with the general plan on grounds of immateriality). *Legality:* Ordinance No. 352, as applied to Friedman's property, constituted an improper and arbitrary exercise of the power of zoning, resulting in unlawful "spot zoning" for the purpose of "keep[ing] it [the property] as it was," in an open-space status quo, thus preventing "any development" thereof. The oppressive effect of the ordinance resulted in denying plaintiff the "use" of his land and in its *dedication* to a public use.

Based upon such findings, the trial court concluded that by adoption of the ordinance the City had "inversely condemned" the property for public use, resulting in the taking of a fee interest as of the date of adoption. It further concluded that such action was irrevocable insofar as plaintiff's "right to compensation" had thereby "vested."

 The sole question to be determined is whether the findings of inverse condemnation upon which the judgment is based are supported by evidence viewed most favorably to the prevailing party below.[7] (*Nestle*

---

[7]Notwithstanding the several findings made in relation to the theories advanced of the ordinance's invalidity, the judgment underlying this appeal is predicated solely upon a theory of inverse condemnation—a conclusion mutually acknowledged by the parties in their briefs. Indeed, the wrongfulness of state action is irrelevant to an action in inverse condemnation; the appropriate remedy for arbitrary and discriminatory zoning lies in

v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]; *Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782 [59 Cal.Rptr. 141, 427 P.2d 805]; 6 Witkin, Cal. Procedure (2d ed. 1971) § 245, p. 4236.) We conclude, for the reasons discussed herein, that the evidence does not support the findings essential to a judgment awarding compensation on a theory of inverse condemnation in any form. We are persuaded by the argument of City and amici that the record reveals no more than a diminution in the market value of the subject property—as a result of the "down-zoning" effected through enactment of the challenged ordinance—for which an action sounding in inverse condemnation will not lie.

I. ■ It is settled law that a zoning action which merely decreases the market value of property does not constitute a compensable taking actionable under a theory of inverse condemnation. (*HFH, Ltd.* v. *Superior Court, supra,* 15 Cal.3d 508, 514-518; *Sierra Terreno* v. *Tahoe Regional Planning Agency* (1978) 79 Cal.App.3d 439, 442 [144 Cal.Rptr. 776]; *Brown* v. *City of Fremont* (1977) 75 Cal.App.3d 141, 146-147 [142 Cal.Rptr. 46]; *Pinheiro* v. *County of Marin* (1976) 60 Cal.App.3d 323, 325 [131 Cal.Rptr. 633]; *Eldridge* v. *City of Palo Alto* (1976) 57 Cal.App.3d 613, 624 [129 Cal.Rptr. 575]; *Morse* v. *County of San Luis Obispo* (1967) 247 Cal.App.2d 600, 602-603 [55 Cal.Rptr. 710]; *Euclid* v. *Ambler Co.* (1926) 272 U.S. 365 [71 L.Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016]; cf. *State of California* v. *Superior Court* (1974) 12 Cal.3d 237, 252-254 [115 Cal.Rptr. 497, 524 P.2d 1281]; *Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d 110, 118-121.) Although arising in a pleadings context, *HFH* is factually parallel and controlling herein; there, allegations of a decline in market value as a result of the change in zoning, coupled with a remaining substantial value, manifested no more than a diminution in market value and failed to state a cause of action for inverse condemnation (*HFH,* 15 Cal.3d at p. 514, and fn. 2, at pp. 512-513); here, in an almost identical ratio of reduction in market value (80 percent), the evidence submitted by Friedman uncontrovertibly established a minimum remaining value after rezoning in the amount of $250,000. A fortiori, *proof* of residual substantial value convincingly rebuts any allegation or claim that Friedman was deprived of *any*

mandamus (*HFH, Ltd.* v. *Superior Court* (1975) 15 Cal.3d 508, 513 and 516, fn. 13 [125 Cal.Rptr. 365, 542 P.2d 237] [cert. den. 425 U.S. 904 (47 L.Ed.2d 754, 96 S.Ct. 1495)]; see also *Selby Realty Co.* v. *City of Buenaventura* (1973) 10 Cal.3d 110, 127-128 [109 Cal.Rptr. 799, 514 P.2d 111]) or declaratory relief (see *Skalko* v. *City of Sunnyvale* (1939) 14 Cal.2d 213 [93 P.2d 93]; *Kissinger* v. *City of Los Angeles* (1958) 161 Cal.App.2d 454, 460 [327 P.2d 10]). Of course, where appropriate to our analysis, the findings bearing upon the theory of recovery necessarily are discussed.

reasonable beneficial use of his property; nor can it support the findings made that no "reasonably viable economic use" exists.[8] Friedman's reliance on our holding in *Eldridge v. City of Palo Alto, supra,* 57 Cal.App.3d 613, does not require a contrary conclusion. In *Eldridge* we merely held that under the facts there pleaded the property owners stated a valid cause of action upon a theory of inverse condemnation (*ibid.* at pp. 633-634). We concluded that the rule of *HFH* may not apply ". . . where the zoning action goes *beyond* the mere diminution of market value, and instead . . . [deprived] the landowner of *any* reasonable or beneficial use of his property, . . ." (*ibid.* at p. 624, italics added); further, that "[w]hether a zoning restriction is so 'arbitrary,' or 'unreasonable,' or 'burdensome,' as to transcend 'proper bounds in its invasion of property rights' " is ordinarily a fact question. (*Ibid.* at p. 628.) ▆ Herein, substantially the same type of use to which the property had long been devoted is permitted under the more restrictive CR zoning (see fn. 3, *ante*) which, as shown by the evidence, would afford a level of beneficial use (e.g., a tennis club) sufficient to warrant a substantial—although lesser—fair market value of the property put to such use.

II. Seizing upon a variety of findings, Friedman steadfastly maintains that the judgment must be affirmed by reason of alleged inequitable conduct undertaken by city officials and residents alike which amounted to an uncompensated taking of his property for a public use. (See *HFH, Ltd.* v. *Superior Court, supra,* 15 Cal.3d 508, 516-517, fn. 14.) Relying chiefly on principles distilled from cases involving inequitable precondemnation activities on the part of the public agency (notably *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345]; *Peacock* v. *County of Sacramento* (1969) 271 Cal.App.2d 845 [77 Cal.Rptr. 391]; *Sneed* v. *County of Riverside* (1963) 218 Cal.App.2d 205 [32 Cal.Rptr. 318]; *Kissinger* v. *City of Los Angeles, supra,* 161 Cal.App.2d 454), he analogizes the findings of public efforts seeking to acquire his land for "open space," together with enactment of ordinance No. 352 restricting the use of his property in its existing condition, as manifesting a settled policy to preserve the open-space condition for public use through the device of oppressive and discriminatory rezoning. However, those authorities are readily distinguishable and the record fails to support such analogy.

---

[8]The trial court found (in favor of Friedman's contention) that the new CR zoning "is not economically feasible," precluded "any reasonably viable economic use" rendering the property of "no practical value or beneficial use . . . in any manner consistent with its value." A similar contention was raised and rejected in *HFH* (15 Cal.3d at pp. 512-513, fn. 2) since there can be "no vested right in existing or anticipated zoning ordinances" (*Morse* v. *County of San Luis Obispo, supra,* 247 Cal.App.2d 600, 602) necessary to a claim of use of commensurate or consistent value.

Each of those cases involved governmental conduct to achieve objectives obtainable only through payment of fair compensation. (*City of Walnut Creek* v. *Leadership Housing Systems* (1977) 73 Cal.App.3d 611, 619-620 [140 Cal.Rptr. 690].) In *Klopping* it was determined that if the city acted unreasonably in issuing *precondemnation* statements, an action in inverse condemnation would lie; here, there was no formal intent to condemn, and the trial court so found. (See *Selby Realty Co.* v. *City of Buenaventura, supra,* 10 Cal.3d 110; *Smith* v. *State of California* (1975) 50 Cal.App.3d 529 [123 Cal.Rptr. 745]; *Silva* v. *City & County of San Francisco* (1948) 87 Cal.App.2d 784 [198 P.2d 78]; see also *Frisco Land & Mining Co.* v. *State of California* (1977) 74 Cal.App.3d 736, 759 [141 Cal.Rptr. 820]; *Elgin Capital Corp.* v. *County of Santa Clara* (1975) 57 Cal.App.3d 687 [129 Cal.Rptr. 376].) The factual allegations in *Sneed* (involving frequent low-flying aircraft in an approach zone directly above the plaintiff's thoroughbred horse-breeding farm) and the evidence in *Peacock* (adoption of a severely restrictive zoning ordinance prohibiting both structures and vegetation) manifested unreasonable and oppressive acts by a public authority—depriving the landowner of *any* beneficial use[9]—tantamount to an actual, compensable taking for a public use. No similar circumstances appear in the instant case.

III. The enactment of ordinance No. 352 did not mandate or effectively commit the property to an actual public use. (*Cf. Sneed* v. *County of Riverside, supra,* 218 Cal.App.2d 205.) To the contrary, as a vehicle of legislative policy regulating the use of land, the challenged ordinance accomplished a public purpose of reasonably limiting the use of a unique parcel of land "for private as opposed to publicly owned and operated recreational facilities." ▮ While a conceived objective of preserving a scenic, historical and singularly desirable open-space resource may result in conferring a public *benefit,* such an otherwise valid purpose and attendant result is not the equivalent of a public *use* requiring compensation. ▮ So long as a rational basis exists for a zoning decision, the purpose or motive of the ordaining body becomes irrelevant to any inquiry into its reasonableness. (See *Ensign Bickford Realty Corp.* v. *City Council* (1977) 68 Cal.App.3d 467, 478 [137 Cal.Rptr. 304]; *Pinheiro* v. *County of Marin, supra,* 60 Cal.App.3d 323, 327-328.) The fact that a zoning regulation arguably restricts a more economic use while permitting others, is simply testimonial to the "price of living in a modern

---

[9]Compare *San Diego Gas & Electric Co.* v. *City of San Diego*▮ (Cal.App.) affirming judgment in inverse condemnation where the only possible land use was effectively prohibited under the city's open-space zone which rendered the property valueless.

enlightened and progressive community." (*Metro Realty* v. *County of El Dorado* (1963) 222 Cal.App.2d 508, 518 [35 Cal.Rptr. 480].)

■ Nor, as recognized in *Selby* (10 Cal.3d at pp. 120-121), do mere planning considerations subject a public entity to a claim of inverse condemnation. As persuasively argued by amici, public discussion and debate vital to sound community planning objectives and policies would be largely stifled if, as Friedman suggests, we view the public dialogue—involving no official action to acquire his property—as rising to a level of "inequitable pre-condemnation activity" justifying monetary sanctions under an assumed theory of inverse condemnation. A more chilling effect upon open and frank discussion essential to the community decision-making process, contrary to legislative policy (see Gov. Code, §§ 11120 et seq., 54950 et seq. and 65033) is difficult to imagine.

IV. Finally, we perceive no basis for relief on the record presented in support of the trial court's findings of arbitrary and unlawful "spot-zoning." (*Kissinger* v. *City of Los Angeles, supra,* 161 Cal.App.2d 454; *Skalko* v. *City of Sunnyvale, supra,* 14 Cal.2d 213; see also *People* ex rel. *Dept. Pub. Wks.* v. *Southern Pac. Trans. Co.* (1973) 33 Cal.App.3d 960 [109 Cal.Rptr. 525].) ■ As previously observed, the appropriate remedy challenging an invalid zoning ordinance lies in an action for mandate or declaratory relief (*HFH, Ltd.* v. *Superior Court, supra,* 15 Cal.3d 508, 516, fn. 13) which—if successful—would result in restoration of the preexisting zoning. Although pleading such counts, no relief thereunder was actively sought or obtained. Significantly, no substantial evidence to support the relevant findings (presumably relied upon in awarding a judgment grounded on the inverse condemnation theory) is disclosed. Unlike *Kissinger,* there was no attempt to depress value in anticipation of contemplated condemnation by adoption of a procedurally defective and discriminatory ordinance reclassifying property in a manner calculated to prevent its improvement "in order that it might be acquired at a lesser price" for airport use (*id.,* 161 Cal.App.2d at p. 462; *cf. People* ex rel. *Dept. Pub. Wks.* v. *Southern Pac. Trans. Co., supra,* 33 Cal.App.3d 960, involving a similar discriminatory purpose to depress value of a right of way intended to be acquired). Nor, as in *Skalko,* did such reclassification result in a use wholly unsuited to the industrial activities in surrounding and similarly situated properties.[10] ■ The

[10]Parenthetically, we note that both *Kissinger* and *Skalko* involved actions for declaratory relief challenging the validity of zoning and do not support Friedman's claim of compensable taking by inverse condemnation.

evidence reveals a legitimate public purpose, untainted by improper motives, to preserve the existing open-space condition of a unique and distinctive property as part of a comprehensive rezoning plan permitting compatible economic uses.[11] Absent evidence of inequitable precondemnation activities, denial of any reasonably beneficial use, or public use, the proof considered by the trial court discloses nothing more than a diminution in market value due to down-zoning for which a cause of action in inverse condemnation will not lie (*HFH, Ltd.* v. *Superior Court, supra*, 15 Cal.3d 508; *Agins* v. *City of Tiburon* (1978) 80 Cal.App.3d 225 [145 Cal.Rptr. 476]; *Pinheiro* v. *County of Marin, supra*, 60 Cal.App.3d 323) and a judgment awarding compensation on such theory may not stand.

Accordingly, the judgment must be reversed. In view of our decision, it becomes unnecessary to reach the remaining contentions presented in City's brief.

The judgment is reversed; City is awarded its costs on appeal.

Elkington, J., and Lazarus, J.,* concurred.

A petition for a rehearing was denied June 30, 1978, and respondents' petition for a hearing by the Supreme Court was denied August 10, 1978. Clark, J., was of the opinion that the petition should be granted.

---

[11]See Government Code sections 65910 and 65560 et seq. declaring a legislative policy that local governments undertake and implement an open-space element within the general plan.

*Retired judge of the superior court sitting under assignment of the Chairperson of the Judicial Council.