[S.F. No. 23866. Mar. 14, 1979.]

DONALD W. AGINS et al., Plaintiffs and Appellants, v.
CITY OF TIBURON et al., Defendants and Respondents.

**COUNSEL**

Reginald G. Hearn for Plaintiffs and Appellants.

Ronald A. Zumbrun, Thomas E. Hookano and Elleene A. Kirkland as Amici Curiae on behalf of Plaintiffs and Appellants.

Robert I. Conn, City Attorney, Gary T. Ragghianti and Richard H. Breiner, Deputy City Attorneys, for Defendants and Respondents.

Evelle J. Younger, Attorney General, E. Clement Shute, Jr., Robert H. Connett, Assistant Attorneys General, and Richard C. Jacobs, Deputy Attorney General, as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**RICHARDSON, J.**—We review the availability of inverse condemnation as a landowner's remedy when a public agency has adopted a zoning ordinance which substantially limits use of his property. We will conclude that although a landowner so aggrieved may challenge both the constitutionality of the ordinance and the manner in which it is applied to his

property by seeking to establish the invalidity of the ordinance either through the remedy of declaratory relief or mandamus, he may not recover damages on the theory of inverse condemnation.

Plaintiffs own five acres of unimproved land in the City of Tiburon, Marin County. Tiburon has an area of 1,676 acres, a population of approximately 6,000, and because of its proximity to San Francisco, its aquatic facilities, temperate climate, and other geographic advantages, is a very desirable suburban residential area. Plaintiffs' real property is ridgeland, possesses views of San Francisco Bay, and was acquired by plaintiffs for residential development.

Tiburon, like every other city in California, is required by state law to prepare a general plan containing, among other things, "A land use element which designates the proposed general distribution and general location and extent of the uses of the land for housing, business, industry, open space . . . and other categories of public and private uses of land. The land use element shall include a statement of the standards of population density and building intensity recommended for the various districts and other territory covered by the plan." (Gov. Code, § 65302, subd. (a).)

Routinely, the development of a general plan entails a careful examination of numerous social and economic factors. Many cities, especially those which are too small to maintain a staff of sufficient size and technical expertise to undertake such a project, seek the advice of expert consultants. The recommendations of these consultants are considered when the local governmental entity prepares its general plan.

In January 1972 Tiburon retained two private consultants, Williams & Mocine and Dean Witter & Co., Incorporated, to prepare advisory reports. The Williams report, issued in October 1972, focused on possible land use designations and recommended that Tiburon attempt to acquire "a substantial portion of Tiburon ridge" for "open space." Plaintiffs' property was identified in the report as one of those parcels of property which were suitable for acquisition for open space. The Witter report, dated July 1972, recommended that the purchase of open space lands be financed through the issuance of $1.25 million of general obligation bonds. The subsequent resolution of the Tiburon City Council approving sale of these bonds did not specifically authorize acquisition of plaintiffs' property or directly refer to it.

By Ordinance No. 124 N.S., effective June 28, 1973, Tiburon adopted widespread zoning modifications which drew upon but did not mirror the consultants' reports. Under the ordinance, plaintiffs' land was designated "RPD-1," defined by Ordinance No. 123 N.S. as a "Residential Planned Development and Open Space Zone." The authorized uses of land so designated are (1) *one-family dwellings*, (2) open space uses, and (3) accessory buildings and accessory uses. The permissible density of buildings is "not less than .2 nor more than 1 dwelling unit per gross acre" depending on other specified provisions. As applied to plaintiffs' five acres "RPD-1" zoning means a maximum of five dwelling units or a minimum of one. Whether plaintiffs are permitted to build five dwelling units, or fewer, will depend upon the particular architectural design contemplated and the results of the required environmental impact report.

Plaintiffs have never made application to use or improve their property following Tiburon's adoption of Ordinance No. 124 N.S., nor have they either sought or received any definitive statement as to how many dwelling units they could build on their land. On October 15, 1973, plaintiffs filed a claim against the City of Tiburon in the amount of $2 million alleging that the adoption of Ordinance No. 124 N.S. had completely destroyed the value of their property. The city rejected the claim on November 12, 1973.

On December 4, 1973, Tiburon filed a complaint in eminent domain against plaintiffs to acquire their property, but on November 1, 1974, filed a notice of abandonment of the proceedings as then authorized by Code of Civil Procedure section 1255a, subdivision (a). (This section was repealed by Stats. 1975, ch. 1275, § 1.) The trial court entered its judgment of dismissal of the action on May 20, 1975. The city paid plaintiffs $4,500 for their necessary expenses incurred during the pendency of the action pursuant to section 1255a, subdivision (c), which then fixed the rights of a condemnee upon abandonment of a condemnation proceeding. The remedy was exclusive and the section did not include, as an element of damages, financial impairment during pendency of the eminent domain action of the owner's right to sell. Accordingly, there was no further cause of action available to plaintiffs by reason of the city's eminent domain proceeding.

On June 16, 1975, plaintiffs filed their complaint in the Marin County Superior Court against the City of Tiburon and Does One through Fifty alleging, as a first cause of action, a claim in inverse condemnation for $2

million damages and requesting, in a second cause of action, declaratory relief, asserting, among other things, that Ordinance No. 124 N.S. is unconstitutional in that it "constitutes a taking of [plaintiffs'] property without payment of just compensation."

Defendants' general demurrer to the first cause of action (inverse condemnation) was sustained without leave to amend. Similarly, their demurrer to the second cause of action (declaratory relief) was sustained with 10 days leave to amend. Plaintiffs declined to amend their second cause of action and plaintiffs appeal from the ensuing judgment of dismissal with prejudice.

Plaintiffs contend that the limitations on the use of their land imposed by the ordinance constitute an unconstitutional "taking of [plaintiffs'] property without payment of just compensation" for which an action in inverse condemnation will lie. Inherent in the contention is the argument that a local entity's exercise of its police power which, in a given case, may exceed constitutional limits is equivalent to the lawful taking of property by eminent domain thereby necessitating the payment of compensation. We are unable to accept this argument believing the preferable view to be that, while such governmental action is invalid because of its excess, remedy by way of damages in eminent domain is not thereby made available. This conclusion is supported by a leading authority (1 Nichols, Eminent Domain (3d rev. ed. 1978) Nature and Origin of Power, § 1.42(1), pp. 1-116 through 1-121), who expresses his view in this manner: "Not only is an actual physical appropriation, under an attempted exercise of the police power, in practical effect an exercise of the power of eminent domain, but if regulative legislation is so unreasonable or arbitrary as virtually to deprive a person of the complete use and enjoyment of his property, it comes within the purview of the law of eminent domain. *Such legislation is an invalid exercise of the police power since it is clearly unreasonable and arbitrary. It is invalid as an exercise of the power of eminent domain since no provision is made for compensation.*" (Italics added.)

We have previously pointed to the general nature of the appropriate remedy in such cases. In *State of California v. Superior Court (Veta)* (1974) 12 Cal.3d 237 [115 Cal.Rptr. 497, 524 P.2d 1281], real parties had been granted a permit to develop their coastal lands by a regional commission. They brought suit when a permit was denied following an appeal to the California Coastal Zone Commission. We held that declaratory relief was an appropriate remedy by which to seek a

declaration that a statute controlling development of coastal lands was facially unconstitutional. Further, insofar as the challenge was to the constitutionality of the act's *application* to the lands of the complaining parties, we concluded that the proper and sole remedy was administrative mandamus.

Similarly, a landowner alleging that a zoning ordinance has deprived him of substantially all use of his land may attempt through declaratory relief or mandamus to invalidate the ordinance as excessive regulation in violation of the Fifth Amendment to the United States Constitution and article I, section 19, of the California Constitution. He may not, however, elect to sue in inverse condemnation and thereby transmute an excessive use of the police power into a lawful taking for which compensation in eminent domain must be paid. (See *Friedman* v. *City of Fairfax* (1978) 81 Cal.App.3d 667, 678 [146 Cal.Rptr. 687].) To the extent that *Eldridge* v. *City of Palo Alto* (1976) 57 Cal.App.3d 613 [129 Cal.Rptr. 575], is contrary, it is expressly disapproved.

 There is a clear, direct and unquestionable constitutional basis for the protection of private property. Amendment V of the United States Constitution provides that "No person shall be . . . deprived of . . . property, without due process of law; nor shall private property be taken for public use, without just compensation." In concert with the foregoing Fifth Amendment language article I, section 19, of the California Constitution mandates that "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has been paid to, or into court for, the owner."

 "Property," in a legal sense, has been broadly defined. The United States Supreme Court has said that the term "property" is not used in "the vulgar and untechnical sense of the physical thing with respect to which the citizen exercises rights recognized by law. . . . [Instead it] denote[s] the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it. . . . The constitutional provision is addressed to every sort of interest the citizen may possess." (*U. S.* v. *General Motors Corp.* (1945) 323 U.S. 373, 377-378 [89 L.Ed. 311, 318, 65 S.Ct. 357, 156 A.L.R. 390].)

 While acknowledging the power of government to preserve and improve the quality of life for its citizens through the regulation of the use of private land, we cannot countenance the service of this legitimate need through the uncompensated destruction of private property rights.

Such Fifth Amendment property rights have been equated by the constitutional draftsmen with the cherished personal protections against self-incrimination, double jeopardy, and the guarantee of due process of law. These rights are protected by the same amendment.

In balancing the constitutional rights of the landowner against the legitimate needs of government we do not ignore well established precedent. In *Pennsylvania Coal Co.* v. *Mahon* (1922) 260 U.S. 393 [67 L.Ed. 322, 43 S.Ct. 158, 28 A.L.R. 1321], an injunction was sought to prevent a coal company from causing subsidence of property due to the company's underground mining activities. This Supreme Court opinion has generated some confusion and has even been cited erroneously for the proposition that inverse condemnation is readily available as a remedy in zoning cases because of Justice Holmes' statement that "The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." (*Mahon, supra,* at p. 415 [67 L.Ed. at p. 326].) It is clear both from context and from the disposition in *Mahon,* however, that the term "taking" was used solely to indicate the limit by which the acknowledged social goal of land control could be achieved by regulation rather than by eminent domain. The high court set aside the injunctive relief which had been granted by the Pennsylvania courts and declared void the exercise of police power which had limited the company's right to mine its land. The court did not attempt, however, to transmute the illegal governmental infringement into an exercise of eminent domain and the possibility of compensation was not even considered.

In *HFH, Ltd.* v. *Superior Court* (1975) 15 Cal.3d 508 [125 Cal.Rptr. 365, 542 P.2d 237], we examined directly the problem of available remedies for aggrieved landowners and held that inverse condemnation does not lie in zoning actions in which the complaint alleges the mere reduction of market value, and that a zoning action which merely decreases the market value of property does not violate the constitutional provisions forbidding uncompensated taking or damaging of property. In *HFH, Ltd.* we specifically noted that "This case does not present, and we therefore do not decide, the question of entitlement to compensation in the event a zoning regulation forbade substantially *all* use of the land in question. We leave the question for another day." (P. 518, fn. 16, italics in original.) We now reach that issue.

While it is true that the land uses which were regulated in *HFH, Ltd.* were commercial, we find no reason to distinguish it on that basis from

similar situations in which the regulation affects land used for residential, recreational, or other purposes, or to extend the additional relief of inverse condemnation to the owners of noncommercial property. (For a discussion of a contrary analysis which recommends the extension of a damages remedy in a noncommercial context, see Ellickson, *Suburban Growth Controls: An Economic and Legal Analysis* (1977) 86 Yale L.J. 385, 507-511.)

We are persuaded by various policy considerations to the view that inverse condemnation is an inappropriate and undesirable remedy in cases in which unconstitutional regulation is alleged. The expanding developments of our cities and suburban areas coupled with a growing awareness of the necessity to preserve our natural resources, including the land around us, has resulted in changing attitudes toward the regulation of land use. Recognition of this historic trend is not new. The United States Supreme Court perceptively observed more than 50 years ago that with the passage of time and increased concentration of people "problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, . . . And in this there is no inconsistency, for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise." (*Euclid* v. *Ambler Co.* (1926) 272 U.S. 365, 386-387 [71 L.Ed. 303, 310, 47 S.Ct. 114, 54 A.L.R. 1016].)

In the half century since *Euclid* the foregoing abstract principles under the force of experience have coalesced into a specific functional requirement. Community planners must be permitted the flexibility which their work requires. As we ourselves have recently observed, "If a governmental entity and its responsible officials were held subject to a claim for inverse condemnation merely because a parcel of land was designated for potential public use on one of these several authorized plans, the process of community planning would either grind to a halt, or deteriorate to publication of vacuous generalizations regarding the future use of land." (*Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 120 [109 Cal.Rptr. 799, 514 P.2d 111].)

Other commentators have recognized that the utilization of an inverse condemnation remedy would have a chilling effect upon the exercise of police regulatory powers at a local level because the expenditure of public funds would be, to some extent, within the power of the judiciary. "This threat of unanticipated financial liability will intimidate legislative bodies and will discourage the implementation of strict or innovative planning measures in favor of measures which are less stringent, more traditional, and fiscally safe." (Hall, *Eldridge* v. *City of Palo Alto: Aberration or New Direction in Land Use Law?* (1977) 28 Hastings L.J. 1569, 1597.)

We envisage that the availability of an inverse condemnation remedy in these situations would pose yet another threat to legislative control over appropriate land-use determinations. It has been noted that "The weighing of costs and benefits is essentially a legislative process. In enacting a zoning ordinance, the legislative body assesses the desirability of a program on the assumption that compensation will not be required to achieve the objectives of that ordinance. Determining that a particular land-use control requires compensation is an appropriate function of the judiciary, whose function includes protection of individuals against excesses of government. But it seems a usurpation of legislative power for a court to force compensation. Invalidation, rather than forced compensation, would seem to be the more expedient means of remedying legislative excesses." (Fulham & Scharf, *Inverse Condemnation: Its Availability in Challenging the Validity of a Zoning Ordinance* (1974) 26 Stan.L.Rev. 1439, 1450-1451; see also Bowden, *Legal Battles on the California Coast: A Review of the Rules* (1974) 2 Coastal Zone Management J. 273.)

Other budgetary consequences reveal themselves when the land use control is exercised by means of the initiative. "Legislation in the nature of zoning can be and has been enacted by the people through a direct initiative. Are the voters, through the initiative power, also to have this unwelcome power to *inadvertently* commit funds from the public treasury? The logical extension of requiring compensation for the mere enactment of a harsh zoning measure indicates that the answer would be in the affirmative. The potential for fiscal chaos would be great if this were the result." (28 Hastings L.J., *supra,* at p. 1598, italics in original.)

In combination, the need for preserving a degree of freedom in the land-use planning function, and the inhibiting financial force which inheres in the inverse condemnation remedy, persuade us that on balance

mandamus or declaratory relief rather than inverse condemnation is the appropriate relief under the circumstances.

■ Having clarified the nature of the remedies available to an aggrieved landowner, we now consider whether the property owners before us established their right to declaratory relief. We conclude that they did not.

■ An ordinance which on its face results in a mere diminution in the value of property is not per se improper. In *HFH, Ltd.* v. *Superior Court, supra,* 15 Cal.3d 508, we examined a change in zoning which reduced the value of property from $400,000 to $75,000. We concluded that no remedy was available for a mere decrease in the value of property. By this holding we acknowledged a practical truism which had been expressed by Justice Holmes more than 50 years ago in the *Mahon* case: "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power." (*Pennsylvania Coal Co.* v. *Mahon, supra,* 260 U.S. at p. 413 [67 L.Ed. at p. 325].)

■ Accepting as we must the general proposition that whether a regulation is excessive in any particular situation involves questions of degree, turning on the individual facts of each case, we hold that a zoning ordinance may be unconstitutional and subject to invalidation only when its effect is to deprive the landowner of substantially all reasonable use of his property. The ordinance before us had no such effect. According to the wording of the ordinance, of which we may take note, the RPD-1 zoning allows plaintiffs to build between one and five residences on their property. This belies plaintiffs' claim that development of their land is forever prevented. Taking cognizance of the use which plaintiffs were entitled to make of their land the trial court was justified in finding that the ordinance did not unconstitutionally interfere with plaintiffs' entire use of the land or impermissibly decrease its value. The trial court acted properly in determining that plaintiffs were not, as a matter of law, entitled to a favorable judgment in declaratory relief.

■ Plaintiffs also argue that the city's "precondemnation activities," those being the authorization of studies which recommended acquisition of plaintiffs' land for open space and bonds for its purchase, and the filing and subsequent abandonment of an eminent domain proceeding, were so unreasonable as to provide a separate basis for an action for inverse

condemnation. Plaintiffs err and we do not find persuasive their reliance on *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345], for support for their contention.

*Klopping* involved a plaintiff's recovery for the decline in market value as the result of an unreasonable delay in the institution of eminent domain proceedings following announcement of intent to condemn, and other unreasonable conduct prior to condemnation. In the matter before us there was no such delay or conduct. Tiburon instituted eminent domain proceedings less than six months after Ordinance No. 124 N.S. was adopted. It is manifest that general land-use planning discussions and related decision-making by elected officials must be both unhampered and public. Together or singly, neither process constitutes a "taking" of the property under consideration. Any other conclusion would violate sound public policy.

Our appellate courts have recognized the appropriate controlling principles. "*Selby* [*supra,* 10 Cal.3d 110] made clear that *Klopping* [*supra,* 8 Cal.3d 39] was no support for a claim that planning designations constitute takings." (*Navajo Terminals, Inc.* v. *San Francisco Bay Conservation etc. Com.* (1975) 46 Cal.App.3d 1, 4 [120 Cal.Rptr. 108].) As was noted in *City of Walnut Creek* v. *Leadership Housing Systems* (1977) 73 Cal.App.3d 611 [140 Cal.Rptr. 690], ". . . the inclusion of the property for public use in a general plan does not give rise to a cause of action. If calling a bond election and urging passage to secure funds for a public purpose constituted a taking, the agency so acting would be subject to suit whether or not the issue carried. The expression of political preference cannot be so burdened." (Pp. 622-623.)

Recognizing the constitutionally protected property interests here involved, we also accept the reasonable latitude which must be afforded public officials in the planning for and implementation of legitimate land use goals. These twin purposes will be served by preserving for the landowner, in appropriate cases, declaratory relief or mandamus remedies. However, the use of inverse condemnation with its imposition of money damages upon the public entity would, in our view, unwisely inhibit the proper and necessary exercise of a valid police power.

The judgment is affirmed.

Bird, C. J., Tobriner, J., Mosk, J., Manuel, J., and Newman, J., concurred.

CLARK, J., Dissenting.—"Private property may be taken *or damaged* for public use *only* when just compensation . . . has first been paid to . . . the owner." (Cal. Const., art. I, § 19; italics added.) "Damage," as used in the constitutional provision, has always included diminution in intrinsic value even when falling short of actual taking, spoilation or invasion. (*Reardon* v. *San Francisco* (1885) 66 Cal. 492 [6 P. 317].)

It must be clear to all of us that, as alleged by plaintiffs, the City of Tiburon has decided through the political process that in order to preserve its way of life and to maintain what is already among the highest residential land values in the state,[1] certain of its property owners must sacrifice use of their lands. Such lands—including plaintiffs'—are thus alleged to have been damaged in order to preserve or enhance the value of undisturbed land. This is the clearest of examples wherein our system functions " 'to sacrifice the individual to the community, and it seems very difficult in reason to show why the [City of Tiburon] should not pay for property which it destroys or impairs the value . . . .' " (*Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 351 [144 P.2d 818].)

Recognizing the policy considerations in resolving the question when a "taking" must be paid for by government and when it may be deemed merely a permissible intrusion incident to governmental function, the United States Supreme Court has stated that a factual consideration "is the extent of the diminution [of property value]. When it reaches a certain magnitude, in most if not all cases there must be an exercise of eminent domain and compensation to sustain the act." (*Pennsylvania Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 413 [67 L.Ed. 322, 325, 43 S.Ct. 158, 28 A.L.R. 1321].) What greater diminution can there be than where—as here—plaintiffs have alleged and the City of Tiburon has admitted that the ordinance complained of "has completely destroyed the value of Plaintiffs'. property for any purpose or use whatsoever . . ."? We have said that the "underlying purpose of our constitutional provision in inverse—as well as ordinary—condemnation is 'to distribute through the community the loss inflicted upon the individual by the making of public improvements' [citation]; 'to socialize the burden . . . —to afford relief to the landowner in cases in which it is unfair to ask him to bear a burden that should be assumed by society' [citation]." (*Holtz* v. *Superior Court* (1970) 3 Cal.3d 296, 303 [90 Cal.Rptr. 345, 475 P.2d 441].) If those words have any meaning at all this must be the case where they are

[1]It is alleged by plaintiffs' complaint and admitted by the city's demurrer that the City of Tiburon has "the highest land value per acre for suburban areas in the State of California."

applicable—unless, of course, the majority deem they are not bound by the honored rule of law which prevents the court on a demurrer from finding factual matters contrary to matters well pleaded in the complaint.[2] (See, *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241].)

The majority opinion attempts to justify its judgment on the ground that plaintiffs—if they are entitled to relief at all—must look to some remedy other than inverse condemnation. (*Ante*, p. 272.) While purporting to recognize that the Fifth Amendment mandates "private property shall not be taken for public use, without just compensation," that the " 'constitutional provision is addressed to every sort of interest the citizen may possess' " (*ante*, p. 273), and that "we cannot countenance the service of [the need of government to improve the quality of life] through the uncompensated destruction of private property rights" (*id.*), the majority refuse to follow these precepts. Their refusal is grounded on their mistaken analysis of this court's earlier decision in *HFH, Ltd.* v. *Superior Court* (1975) 15 Cal.3d 508 [125 Cal.Rptr. 365, 542 P.2d 237].

In *HFH* the majority held that inverse condemnation does not lie in a downzoning action when the complaint alleges mere reduction in market value. That case expressly stands for the proposition that a zoning ordinance which "merely decreased the market value of property" does not necessarily violate constitutional provisions "forbidding uncompensated taking or damaging" of property. (*HFH, Ltd.* v. *Superior Court,* *supra,* 15 Cal.3d 508, 518.) If, as the majority held in *HFH,* the difference between "merely decreasing" a property value on the one hand and "taking" a property interest on the other is one of degree, the majority today—in view of the admitted allegation that the ordinance "has completely destroyed the value of plaintiffs' property for any purpose or use whatsoever"—obliterate that distinction. Under today's holding inverse condemnation is no longer an available remedy—perhaps short of government actually dispossessing an owner—whatever the harshness of a zoning regulation. The distinction which the majority purport to carefully draw in *HFH* has been rejected and that case provides no support for today's decision.

---

[2]Conclusionary allegations of damage to property are insufficient to support—against a demurrer—a complaint in inverse condemnation. (See, *Hecton* v. *People* ex rel. *Dept. of Transportation* (1976) 58 Cal.App.3d 653 [130 Cal.Rptr. 230].) Additionally, the particular facts of the case must be set out in the complaint. (*Id.,* at p. 657.) Plaintiffs have alleged with factual particularity the significant activities taking place prior to and constituting the inverse condemnation. They also allege the lack of remaining reasonable beneficial use resulting from these activities. (Cf. *Pinheiro* v. *County of Marin* (1976) 60 Cal.App.3d 323, 328 [131 Cal.Rptr. 633].)

Until today, this court has adhered to its rule that a harsh zoning regulation gives rise to inverse condemnation. (See *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39, 46 [104 Cal.Rptr. 1, 500 P.2d 1345].) The rule, moreover, is compelled by the Legislature: "The Legislature hereby . . . declares that this article [Open-Space Zoning] is not intended and shall not be construed, as authorizing the city . . . to exercise its power to adopt . . . an open-space zoning ordinance in a manner which will . . . damage private property for public use without the payment of just compensation therefor." (Gov. Code, § 65912; see also, Gov. Code, § 51073.) However, the majority reject the established rule and legislative direction in disapproving the recent case of *Eldridge* v. *City of Palo Alto* (1976) 57 Cal.App.3d 613 [129 Cal.Rptr. 575] (petn. for hg. den. July 15, 1976). That case involves a particularly harsh zoning ordinance. The court concluded, after a detailed review of pertinent decisions, "that a valid zoning ordinance may nevertheless operate so oppressively as to amount to a taking, thus giving an aggrieved landowner a right to damages in inverse condemnation." (*Id.,* at p. 621.) The "leading authority" relied on by the majority (*ante,* p. 272) is in agreement with *Eldridge.* (See, 1 Nichols on Eminent Domain (3d rev. ed. 1978) Nature and Origin of Power, § 1.42(1), pp. 1-116 through 1-121; 2 Nichols on Eminent Domain (3d rev. ed. 1978) Taking and Damage, § 6.3, p. 6-65.)

When a zoning restriction is so harsh as to transcend a constitutionally protected property right is a question of fact to be determined by trial rather than by demurrer. (See *Wilkins* v. *City of San Bernardino* (1946) 29 Cal.2d 332, 338-339 [175 P.2d 542]; *Eldridge* v. *City of Palo Alto, supra,* 57 Cal.App.3d 613, 628.) Plaintiffs have well pleaded a cause of action in inverse condemnation, and should be afforded an opportunity to prove their allegations.

Today's real issue is the extent to which a court will permit—even encourage—governmental agency intrusion into a constitutionally protected area. The majority argue we must condone greater intrusion; that we must recognize "changing attitudes toward the regulation of land use" (*ante,* p. 275); that community planners must be permitted the flexibility which their work requires (*ante,* p. 275); that the use of inverse condemnation "will have a chilling effect upon the exercise of police regulatory powers at a local level" and " 'will discourage the implementation of strict or innovative planning measures in favor of measures which are less stringent, more traditional, and fiscally safe' " (*ante,* p. 276); and

that enactment of a zoning ordinance being essentially a legislative process, courts should cease affording a legal remedy in inverse condemnation.[3]

Today's decision effectively pronounces that henceforth in California title to real property will no longer be held in fee simple but rather in trust for whatever purposes and uses a governmental agency exercising legislative power elects, without compensation. While the majority of this court can finally declare that such a taking does not offend local constitutional prohibitions, their judgment does not foreclose federal constitutional examination. It is clear that compelling federal authority requires compensation for the taking alleged by plaintiffs in this case. The United States Supreme Court will hopefully adhere to Justice Holmes' admonition that "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." (*Pennsylvania Coal Co.* v. *Mahon, supra,* 260 U.S. 393, 416 [67 L.Ed. 322, 326]; see also *Goldblatt* v. *Hempstead* (1962) 369 U.S. 590, 594 [8 L.Ed.2d 130, 134, 82 S.Ct. 987]; *Armstrong* v. *United States* (1960) 364 U.S. 40, 49 [4 L.Ed.2d 1554, 1561, 80 S.Ct. 1563]; *U.S.* v. *Central Eureka Mining Co.* (1958) 357 U.S. 155, 168 [2 L.Ed.2d 1228, 1236, 78 S.Ct. 1097]; *Berman* v. *Parker* (1954) 348 U.S. 26, 36 [99 L.Ed. 27, 39, 75 S.Ct. 98]; *U.S.* v. *Willow River Co.* (1945) 324 U.S. 499, 502 [89 L.Ed. 1101, 1107, 65 S.Ct. 761]; *Block* v. *Hirsch* (1921) 256 U.S. 135 [65 L.Ed. 865, 41 S.Ct. 458, 16 A.L.R. 165].) Lower federal court decisions are universally contrary to the majority opinion in this case. When the Richmond Redevelopment Agency urged that because it exercised police powers it did not have to pay just compensation to a landowner, the Ninth Circuit held: "It is clear . . . that a governmental agency acting pursuant to the State's police power must pay just compensation for any taking it effects." (*Richmond Elks Hall Assn.* v. *Richmond Redevelopment* (9th Cir. 1977) 561 F.2d 1327, 1332; see also *Beneson* v. *United States (Ct. Cl. 1977) 548 F.2d 939, 947;*

[3]The majority's holding unnecessarily goes far beyond a mere determination that—in the majority's view—plaintiffs in this case are entitled to no relief. In the concluding portions of the majority opinion it is stated—although as earlier noted contrary to established rules on review of judgments following sustaining of demurrer—that the Tiburon ordinance does not deprive plaintiffs of "substantially all reasonable use" of their property. (*Ante,* p. 277.) Thus *HFH, Ltd.* v. *Superior Court, supra,* 15 Cal.3d 508, requires rejection of plaintiffs' claim because there has been a "mere diminution" of value as opposed to a taking of property, according to the majority. The majority's further assertion that inverse condemnation is no longer available to compensate an aggrieved landowner, appears to be—after more than a century of settled law to the contrary—obiter dicta. Such far-reaching pronouncement would be better left to another day and case wherein the issue is squarely presented and the parties have full opportunity to address it.

*Drakes Bay Land Company* v. *United States* (Ct.Cl. 1970) 424 F.2d 574, 584; *Dahl* v. *City of Palo Alto* (N.D.Cal. 1974) 372 F.Supp. 647, 648-649.)

The Supreme Court's latest expression of continuing adherence to the mandate of the Fifth and Fourteenth Amendments is contained in *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency* (1979) — U.S. —[59 L.Ed.2d 401, 99 S.Ct. 1171]. In that case lands originally zoned as residential and commercial were rezoned by an interstate agency to allow limited residential use subordinated to public recreational use. Property owners claimed that the land use ordinance constituted inverse condemnation. The district court held that a cause of action for inverse condemenation was sufficiently alleged but that the action could not be maintained against the interstate agency, and that individual members of the agency were immune from suit. The court of appeals held that the interstate agency was federal in character, that the agency was therefore immune under the Eleventh Amendment, and that individual members of the agency were also immune. The Supreme Court answered by holding a cause of action was properly alleged, and that the interstate agency was neither federal in character nor immune, although individual agency members were immune. While the court was primarily concerned with immunity issues, the sense of the holding is that an action in inverse condemnation lies for a taking brought about by land use regulation of the very nature involved in the instant case.

Particular areas of concern must be seen arising from today's decision. First, the majority's solution is really a nonremedy for an aggrieved landowner. If he can protect his lands only through a proceeding to declare the invalidity of a land use regulation, he must lose interim use of his land—most likely for a period of years—suffering substantial legal costs, even though he may ultimately prevail. Moreover, there is nothing to prevent the governmental agency from reenacting a modified ordinance compelling a second or even third proceeding—a burden exceeding bare possibility in view of the majority's invitation to oppressive land use limitation. Many landowners—particularly small ones—will be economically unable to challenge even a confiscatory enactment, being compelled to walk away from their properties.

Perhaps of greater concern is the consequence that Tiburon—and many other govenmental agencies enacting similar land use plans—will price properties within their control out of reach of most people. Only the most wealthy will be able to afford purchase of and construction on lands in such areas. The environment which Tiburon seeks to preserve will

disproportionately benefit that wealthy landowner, whose home will be surrounded by open space, unobstructed view and unpolluted atmosphere.

I reject the majority rationalization. It abdicates our responsibility to give meaning and substance to constitutional mandate.

Today's decision must further encourage city councils and their zoners to politically preserve entrenched property use. The decision not only · shuts Mr. Agins out from our courtroom, but also his successor-owners from sharing a nice but exclusive environment.

The judgment of dismissal should be reversed.

Appellants' petition for a rehearing was denied May 17, 1979. Clark, J., was of the opinion that the petition should be granted.