[Nos. B003987, B005635. Second Dist., Div. One. Mar. 3, 1986.]

HOWARD PALMER et al., Plaintiffs and Appellants, v. CITY OF OJAI et al., Defendants and Respondents.

■■■■■■■■■■■■
■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■

---

**COUNSEL**

Drescher, McConica & Young, Lagerlof, Senecal, Drescher & Swift, Fadem, Berger & Norton and Michael M. Berger for Plaintiffs and Appellants.

Monte L. Widders, City Attorney, Burke, Williams & Sorensen and Katherine E. Stone for Defendants and Respondents.

---

**OPINION**

**HANSON (Thaxton), Acting P. J.**—Consolidated appeals taken from judgments rendered in superior courts in Ventura County.

Petitioners Howard Palmer, doing business as Palmer Development Company and Ojai Investments, a California limited partnership, sought a writ of mandate to compel certain actions by respondents, including the issuance of a building permit for a neighborhood commercial shopping center in Ojai. Named as respondents were the City Council, the Planning and Building Department, and the Planning Commission of the City of Ojai, and their individual members. The petition was denied; judgment was entered for respondents and a timely appeal from the judgment was taken.[1]

Plaintiffs also filed a complaint for damages against the City of Ojai, the city council, the planning and building department and the planning and architectural commission, as well as Does, seeking $6,375,000 in damages

---

[1] In our discussion, Palmer and Ojai Investments will be referred to as the plaintiffs, or Developer. The various city departments or bodies and their individual members will be referred to as the defendants or City. The shopping center will sometimes be referred to as the development project or Project.

Unless otherwise specified, the statutory references will be to the Government Code. The pertinent provisions of the Government Code with which this litigation is concerned will sometimes be referred to as the Statutory Scheme.

(as well as attorney fees, expenses and interest) for City's assertedly wrongful refusal to take action on the development project, i.e., the shopping center, alleging various theories of recovery.

Six causes of action were stated: (1) violation of federal civil rights, pursuant to 42 United States Code section 1983; (2) violation of California constitutional rights; (3) inverse condemnation; (4) failure to discharge mandatory duties; (5) breach of the implied covenant of good faith and fair dealing; and (6) entitlement to declaratory relief. The complaint was subsequently amended to add a cause of action for negligence per se.

Defendants' demurrer to the amended complaint was sustained without leave to amend save for two causes of action, the fourth and the sixth. Plaintiffs then filed a second amended complaint alleging four causes of action for failure to discharge mandatory duties and negligence per se. Defendants again demurred and the demurrer was sustained without leave to amend. By stipulation, the parties agreed to the filing of a third amended complaint, with defendants' demurrer sustained without leave to amend.

Judgment was entered for defendants; a timely appeal was taken. The two matters have been consolidated for review in this court. With respect to the complaint for damages, a joint appendix in lieu of the clerk's transcript has been prepared, pursuant to rule 5.1 of the California Rules of Court.

FACTUAL SUMMARY AND PROCEDURAL HISTORY

On December 18, 1980, Developer filed an "Environmental Assessment Application" with defendants concerning a plan to develop 31 acres of land appropriately zoned on the Maricopa Highway in Ojai, near the local high school. Developer sought a subdivision permit and a conditional use permit, as well as a building permit.

The acreage subject to proposed development had formerly been a farm, but had not been used for agricultural purposes for years. It was filled with shrub grass and weeds. The project contemplated the use of 21 acres for the construction of 73 housing units. The remainder was to be used for a shopping center which would house a grocery store and a junior department store along with a restaurant, banking facilities and service stores. Provision had been made for parking. The conditional use permit was necessary for the grocery store and the junior department store; the current general plan proposed zoning included the remainder of the proposed commercial and residential usages. With the exception of drainage problems, increased noise and glare, no particular environmental or historical concerns were noted.

Prior to the December 18, 1980 filing, Developer had discussed the project with City officials for nearly a year. An earlier filing had been rejected because of a missing form; the December 18, 1980 filing included a site plan.

There was no formal response by City to the application, except City's planning director marked it "accepted" as of February 1981. Discussions continued between City and Developer. On April 14, 1981, City decided that an "Environmental Impact Report" (EIR) was required. Environmental discussions continued between City and Developer. Developer paid for the proposed EIR; Developer also hired consultants who reported to City on such matters as oak trees on the property for which City had expressed concern.

In September 1981, Developer complained that no EIR consultant had been selected by City. An EIR was prepared but rejected by City in March 1982. In May 1982, Developer made specific requests for the subdivision permit and the conditional use permit. By August 1982, the second EIR, for which Developer had also paid, was not complete and Developer complained in writing about the passage of time.

On January 20, 1983, Developer requested issuance of the necessary permits. On January 25, 1983, Developer submitted building plans and requested a building permit. The request was refused. On February 8, 1983, two meetings were held on the same evening by the Ojai Architectural and Planning Commission and the City Council of Ojai. Petitions had been circulated among Ojai citizens about the proposed development project, and the public mood was generally disapproving. At the meetings local citizens spoke adversely about the project, stressing the need to protect Ojai's artistic simplicity. The planning commission denied Developer's requests for the necessary permits. The city council held a public hearing and denied lot division and certification of the EIR.

This two-pronged litigation ensued for mandate and for damages as the result of City's refusal to permit Developer to proceed. Developer complained below, as it does here, that City, by protracted delay, had not complied with applicable statutory law.

## The Statutory Scheme

In 1977 the California Legislature added chapter 4.5, entitled "Review and Approval of Development Projects" to the Government Code, commencing with section 65920. (Stats. 1977, ch. 1200, § 1, p. 3993.)

In section 65921, the Legislature declared: "The Legislature finds and declares that there is a statewide need to ensure clear understanding of the specific requirements which must be met in connection with the approval of development projects and to expedite decisions on such projects. Consequently, the provisions of this chapter shall be applicable to all public agencies, including charter cities." In the years since enactment, certain clarifying and expanding amendments have been made, but there have been no material alterations in the original Statutory Scheme.

Chapter 4.5 contained some definitions which are pertinent to our discussion here. Section 65927 defined development in a very broad manner; included was the subdivision of land pursuant to the Subdivision Map Act (Gov. Code, § 66410 et seq.), and the construction of all private as opposed to public facilities.[2] A development project was one which involved the issuance of a permit for construction or reconstruction but not a permit to operate. (§ 65928.)

A "lead agency" meant the public agency which has the principal responsibility for approving a project (§ 65929) and a "responsible agency" was defined as "a public agency, other than the lead agency, which has responsibility for carrying out or approving a project." (§ 65933.)

With respect to "expeditious decision-making," one object of legislative concern, the time limitation sections of chapter 4.5 began with section 65943, which, as it read during the events which gave rise to this litigation, stated: "Not later than 30 calendar days after any public agency has received an application for a development project, such agency shall determine in writing whether such application is complete and shall immediately transmit such determination to the applicant for the development project. *If such written determination is not made within 30 days after receipt of the application, the application shall be deemed complete for the purposes of this chapter.* In the event that the application is determined not to be complete, the agency's determination shall specify those parts of the application which are incomplete and shall indicate the manner in which they can be made complete." (Italics added.)

This section was substantially amended by Statutes 1984, chapter 1723, section 1, to provide procedures for handling disputes that might develop between the public agency and the applicant concerning what constitutes

---

[2]"Development" was declared to include placement or erection, discharge or disposal, grading, removing, extraction, change in density of land use, land division (other than Public), change in intensity of use of water, construction, reconstruction, demolition, alteration, removal, "on land, in or under water."

"completeness" of an application for section 65943 purposes, but significantly, the 30-day time limitation remained intact.

The next time limitations were contained in sections 65950 and 65952. Section 65950 states: "Any public agency which is the lead agency for a development project *shall approve or disapprove such project within one year from the date on which an application requesting approval of such project has been received and accepted as complete by such agency.* As specified in sections 21100.2 and 21151.5 of the Public Resources Code, the period specified in such sections shall also begin on such date." (Italics added.)[3] Section 65952 states: "Any public agency which is a responsible agency for a development project shall approve or disapprove such project within whichever of the following time periods is longer: [¶] (a) Within 180 days from the date on which the lead agency has approved or disapproved such project. [¶] (b) Within 180 days of the date on which completed applications for such projects have been received and accepted as complete by each such responsible agency."

With respect to the consequences for failing to comply with these time limitations, section 65956 declared:

"(a) If any provision of law requires the lead agency or responsible agency to hold a public hearing on the development project and the agency has not held such hearing at least 60 days prior to the expiration of the time limits established by Sections 65950 and 65952, the applicant or his or her representative may file an action pursuant to Section 1085 of the Code of Civil Procedure to compel the agency to hold such hearing and the court shall give such proceedings preference over all other civil actions or proceedings, except older matters of the same character.[4]

"(b) *In the event that a lead agency or a responsible agency fails to act to approve or to disapprove a development project within the time limits required by this article, such failure to act shall be deemed approval of the development project.*

"(c) Failure of an applicant to submit complete or adequate information may constitute grounds for disapproving a development project." (Italics added.)

---

[3]Public Resources Code sections 21100.2 and 21151.5 (found in the California Environmental Quality Act, CEQA) both have reference to a one-year time limitation in completing environmental review. In Government Code section 65951, a provision for waiver of time limits by a lead agency was enacted if a combined impact report and statement are being prepared pursuant to section 21083.6 of the Public Resources Code (CEQA), but the lead agency must act on the project within 60 days of receipt of the reports and statements.

[4]Subdivision (a) was added to the section by amendment in 1982.

It was further provided that these time limitations could be extended once for a period not to exceed 90 days if the public agency and the applicant agreed to such extension. (§ 65957.) More importantly, section 65957.1 provided that "In the event that a development project requires more than one approval by a public agency, such agency may establish time (1) for submitting the information required in connection with each separate request for approval and (2) for acting upon each such request; *provided, however, that the time period for acting on all such requests shall not, in aggregate, exceed those time limits specified in Sections 65950 and 65952.*"

## THE WRIT OF MANDATE

The petition for writ of mandate, seeking to compel City to issue the necessary permits for the project, was based on the Statutory Scheme discussed *supra;* in effect, Developer claimed that City had not observed certain time limitations set forth in the statutes, including those providing for a 30-day period to accept Developer's application as complete and the 1-year period for approving or disapproving the accepted, "complete" application, and should thus suffer the consequences of failing to follow the law: deemed approval of the project. Developer contended that what had been discretionary during the allowable time periods had become mandatory when those periods elapsed without City's taking appropriate action as envisioned by the Legislature, and thus Developer was entitled to a writ of mandate "to compel the performance of an act which the law specially enjoins. . . ." (Code Civ. Proc., § 1085.)

In the trial court, City claimed that Developer had not really applied for City action on the project until May 1982, when the specific requests for planning commission and city council action were considered by those bodies, i.e., the requests for conditional use permits, lot division and EIR certification. The City thus argued that rejection of the project, within the next year on February 8, 1983, was timely within the meaning of sections 65950, 65952 and 65956.

Plaintiffs, however, pleaded not only the December 18, 1980 filing of the "Environmental Assessment Application" but explained that "On or about December 2, 1980, Petitioners presented an Environmental Assessment Application and an application for conditional use permit [CUP] for the Palmer Development project to Respondent PLANNING DEPARTMENT on the forms prescribed by the City of Ojai, together with a check for the required fees. Respondent PLANNING DEPARTMENT refused to accept said CUP application and told Petitioners that the CUP application and all other requests for approval would not be accepted until the environmental review process under the California Environmental Quality Act (hereinafter, 'CEQA') (Cali-

fornia Public Resources Code §§ 21000 et seq.) was substantially complet-ed." The proper interpretation of the Statutory Scheme's use of the term "application" as the trigger for commencement of time limitations was not the primary ground upon which City defended in the trial court.

 City relied on *Horn v. County of Ventura* (1979) 24 Cal.3d 605 [156 Cal.Rptr. 718, 596 P.2d 1134], wherein the California Supreme Court held that land use decisions which are adjudicatory in nature and substan-tially affect the property rights of owners of adjacent parcels may constitute deprivation of property within the context of procedural due process pur-suant to both the United States and California Constitutions if there is no provision for notice and hearing prior to the decisions made. It was City's position that since the citizens of Ojai had not been afforded such notice and hearing within the time frames contemplated by the Statutory Scheme, *the Statutory Scheme itself* was constitutionally defective and provided no basis for compelling defendants to bear the consequences of section 65956, sub-division (b).

The trial court, during the proceedings on the writ, declared:

"Well, one, the matter of standing I believe is one that Drum[5] has taken care of. Secondly, as to the more substantive issue, it's a fascinating one. There is no question that the government code section says specifically that it shall be deemed to have been granted. [¶] And I believe that obviously the Legislature was attempting to insure that the lead agency, in this case, the City, would proceed quickly and would not use as a tactic the stalling of various proceedings, which is a laudable goal. [¶] The difficulty that I have with that, however, is that however laudatory and desirable that goal, that it by its very nature, and with no way of getting around it that I can see, basically precludes the lead agency and any other agencies that might wish to be a party, and certainly any members of the general public from a meaningful participation as required by both the U.S. and California con-stitution in the process."

Later, the court declared, in response to counsel for plaintiffs' suggestion that due process should be afforded to everyone, "Your client [plaintiffs] has never had anything. He's not had the project already approved by any-body. He's simply coming in—it's good lawyering—he's coming in on a technicality. He's trying to get this through the back door, what I again suspect is not going to happen through the front door, and while it has

---

[5]City claimed to have standing to claim the constitutional rights recognized in *Horn* by citing *Drum v. Fresno County Dept. of Public Works* (1983) 144 Cal.App.3d 777 [192 Cal.Rptr. 782].

enormous impact on him, I can't see that his due process rights have been too trampled, as you said."

Declaring that the Legislature had not given the problem raised in *Horn* sufficient thought when drafting the Statutory Scheme, the trial court denied the petition and granted judgment on the pleadings to City on their first affirmative defense.

## THE STANDARD OF REVIEW

■ Judgment on the pleadings is tantamount to that of sustaining a demurrer without leave to amend, in terms of the standard of review employed by an appellate court. (6 Witkin, Cal. Procedure (3d ed. 1985) Proceedings Without Trial, § 263, p. 565.) The appropriate standard requires an appellate court to accept *facts* well pleaded in the pleader's petition or complaint as true. Arriving at legal conclusions, of course, remains the province of the court. (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187], cert. den. 432 U.S. 907 [53 L.Ed.2d 1079, 97 S.Ct. 2951] (1977).)

## THE APPEAL FROM THE DENIAL OF MANDATE

■ As indicated, the trial court expressed the opinion that it had no choice but to declare the Statutory Scheme described above constitutionally invalid because no provision had been made for hearing and notice to citizens who might be adversely affected by a project within the purview of the Statutory Scheme.

We observe, first of all, that the parties do not really disagree on the *meaning* of the Statutory Scheme as an expression of legislative intent, but only on the *consequences* attendant upon City's failure to comply with the applicable provisions. This posture is understandable, for the legislative intent was made unmistakably clear in section 65921. There was a dual concern for (1) establishing guidelines for communication between developer-applicants and public agencies, communication intended to remove gamesmanship from the application process, and (2) establishing time limitations which would allow full and fair consideration of applications for development by public agencies while protecting the applicants from the arbitrariness and caprice associated with unjustifiable delay. ■ In the face of the plain statutory language, there is no need to resort to rules of statutory construction to ascertain legislative intent; it was made clear. (*Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148].)

Secondly, it should be noted what the Statutory Scheme did *not* do. It did not purport to compel public agencies to exercise their discretionary power with respect to development applications in any particular manner; it merely placed a time limitation on that exercise of discretion. It can fairly be said, however, that one thrust of the legislation was recognition that delay *can* constitute denial; time, accordingly, was the essence of the Statutory Scheme's provisions on development application procedures.

Thirdly, it is clear that the Legislature had in mind relevant provisions of the California Environmental Quality Act (CEQA) and the Subdivision Map Act as well, and intended that the time limits of the Statutory Scheme would harmonize with those provisions.

We hold that these realities about the Statutory Scheme are evident on its face. ▮ We turn now to the constitutional defect perceived by the trial court, i.e., the absence of provisions for some type of notice and hearing for neighbors of a proposed project who have constitutionally protected due process rights in connection with the proposed development. (*Horn* v. *County of Ventura, supra,* 24 Cal.3d 605.)[6] ▮ It is elementary that a statute will be judicially construed in a manner upholding its constitutional validity whenever possible. (1 Sutherland, Statutory Construction (4th ed. 1985) Limitations on Legislative Power, § 2.01, p. 15.) This approach to statutory construction has been strongly adhered to in this state, as a concomitant of the Legislature's "plenary authority" to enact legislation consistent with constitutional standards. (*Methodist Hospital of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161].)

▮ The fact that the Legislature did not see fit to address the problem presented in *Horn* has, in our view, no fatal effect on the Statutory Scheme whatsoever. The trial court's determination that the absence of time provisions relating to *Horn* rendered the Statutory Scheme unconstitutional appears to be based on a misconception of who it is that owes the duty of notice and hearing to interested neighbors of a development project. As *Horn* itself makes clear, it is not the developer-applicant who has the duty; it is the public agencies themselves, including City.

No argument has been presented here that one year is not sufficient time for a "lead" agency to address its functions and concerns with respect to a development application. Those functions and concerns undoubtedly include assessment of environmental impact and economic effects as well as the

---

[6]It should be noted that this record does not contain any indication that landowners adjacent to the project attempted to have a hearing during the pertinent time period, nor had made complaints relative to notice and hearing.

sense of whether a particular development will further a community's desired direction. (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].) They also now include the duty to inform the neighbors of a proposed development project of the possibility of approval and of the potential consequences of such approval. In the matter before us, City's failure to follow *Horn* may *not* be used by City to invalidate legislative enactments not in any way inconsistent with the procedural due process considerations involved in *Horn*.

■ The real problem presented by the Statutory Scheme is in determining the *consequences* of City's noncompliance. We reject City's insistence that the application of Developer on December 18, 1980, was not really an application at all. We hold it was such an application.[7] None of the requisite deadlines were met by City, for whatever reasons. Whether the conduct of the planning commission or the city council is considered, their actions before and on February 8, 1983 were well beyond those deadlines.

What is required is construction of the Statutory Scheme as directory or mandatory in nature. If the Scheme is directory, lack of compliance does not necessarily result in "deemed approved" status for the project. If the Scheme is mandatory, however, it does. (See generally, 1A Sutherland, Statutory Construction, *supra,* Mandatory, Directory, Prohibitory and Permissive Statutes, § 25.03, pp. 441-443.)

Section 65956, subdivision (b) contains the legislative intention in plain language. While the Scheme abounds with the use of the word "shall," that is not dispositive of the issue. ■ As was explained in *Morris* v. *County of Marin* (1977) 18 Cal.3d 901, 909-910 [136 Cal.Rptr. 251, 559 P.2d 606] explained, quoting *Pulcifer* v. *County of Alameda* (1946) 29 Cal.2d 258, 262 [175 P.2d 1], "there is no simple, mechanical test for determining whether a provision should be given 'directory' or 'mandatory' effect. 'In order to determine whether a particular statutory provision . . . is mandatory or directory, the court, as in all cases of statutory construction and interpretation, must ascertain the legislative intent. In the absence of express

---

[7]The application, which was lengthy and contained considerable information provided by Developer, was, in our view, an application *for development* regardless of the title chosen by City to place on the forms; it has been included in the record on appeal. We conclude that the trial court, by addressing the constitutional issue raised by *Horn, did* determine that the application of December 18, 1980, was one within the meaning of the statute, or there would have been no need to proceed on the constitutional issue and rule on that particular defense. This circumstance compels the conclusion that when the petition for mandate is heard on its merits, the scope of triable issues will be reduced to those determining whether or not there has been compliance with the statute.

language, the intent must be gathered from the terms of the statute construed as a whole, from the nature and the character of the act to be done, and from the consequences which would follow the doing or failure to do the particular act at the required time. [Citation.] When the object is to subserve some public purpose, the provision may be held directory or mandatory as will best accomplish that purpose [citation] . . . ." (Fn. omitted.) Of interest in *Morris*, also, is the discussion in footnote 4, 18 Cal.3d 908-909, declaring that "the 'directory-mandatory' distinction is concerned only with whether a *particular remedy*—invalidation of the ultimate governmental action—is appropriate when a procedural requirement is violated; even when invalidation is not appropriate, other remedies—such as injunctive relief, mandamus or monetary damages—may be available to enforce compliance with the statutory provision. Indeed, the availability or unavailability of alternative remedies may have an important bearing on whether a procedure is to be accorded 'directory' or 'mandatory' effect."

■ We are aware that our Supreme Court has stated, in *Edwards* v. *Steele* (1979) 25 Cal.3d 406, 410 [158 Cal.Rptr. 662, 599 P.2d 1365], that time limitations in and of themselves are normally viewed as "directory" rather than "mandatory." (See also 2A Sutherland, Statutory Construction, *supra*, Mandatory and Directory Construction, § 57.19, p. 682.) ■ Two factors may, however, persuade to the contrary: (1) Where "time is of the essence" in the legislation and (2) where the penalty for noncompliance, i.e., the consequences, has been specified in the legislation itself. The legislative materials all support the view that the intent of the Legislature was to place reasonable but firm time limitations on the deliberations of public agencies concerning land use decisions.[8] The penalty was specified. We conclude that the Statutory Scheme created a mandatory, rather than a directory duty.

Accordingly, we hold that the trial court erred in granting defendants judgment on the pleadings. We address next the issue of the damages sought for City's noncompliance with the law.

## DAMAGES

The question is presented as to whether Developer is entitled to the alternative remedy of damages for the loss sustained from City's breach of the

---

[8]E.g., Legislative Counsel's Digest of Assembly Resolution No. 884, Statutes (1977 Reg. Sess.) Summary Digest, pages 338-340; Assembly Committee on Resources, Land Use and Energy, Staff Analysis of Assembly Bill No. 884 (1977 Reg. Sess.); and see California State Administrative Manual, Office of Planning and Research, "Permit Guidelines" (1978).

mandatory duty to comply with the time limitations set forth in the Statutory Scheme of chapter 4.5 of the Government Code. We hold that Developer is not so entitled.

Developer has pleaded various theories, encompassing the breach of mandatory duty, inverse condemnation and deprivation of federally protected constitutional rights, in an effort to establish financial liability on the part of City. Cognizant that existing California law has generally rejected the use of financial liability as a viable remedy in land use cases, Developer points to the growing body of evidence that the federal courts, including the United States Supreme Court, are looking at California's position in this regard with disfavor, detecting constitutional infirmity in the face of the 5th and 14th Amendments to the United States Constitution, which preclude the destruction of private property interests by the government without just compensation. As was pungently stated in *San Diego Gas & Electric Co.* v. *San Diego* (1981) 450 U.S. 621, 661 [67 L.Ed.2d 551, 578, 101 S.Ct. 1287], in footnote 26 of the dissenting opinion, imposition of financial liability might spur more rational land use planning than less: "After all, if a policeman must know the Constitution, why not a planner?"

Defendants rely on a long list of California decisions which have expressed a strong public policy insulating land use planning from civil liability. The most recent and pertinent of these decisions is *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266 [157 Cal.Rptr. 372, 598 P.2d 25], affirmed (1980) 447 U.S. 255 [65 L.Ed.2d 106, 100 S.Ct. 2138], which rejected a claim for monetary damages stemming from a zoning determination by Tiburon which was destructive to plaintiff Agins' property interests. After discussing the "chilling effect" the spectre of financial liability might introduce into local planning arenas, the California Supreme Court declared that "the need for preserving a degree of freedom in the land-use planning function, and the inhibiting financial force which inheres in the inverse condemnation remedy, persuade us that on balance mandamus or declaratory relief rather than inverse condemnation is the appropriate relief under the circumstances." (*Id.,* at pp. 276-277.) *Agins* has not been overruled. While it concerned inverse condemnation damages assertedly resulting from a zoning determination—traditionally viewed as both legislative and discretionary governmental conduct—we perceive the statement of public policy as sufficiently strong and clear to preclude both direct and indirect challenge to its application in land use cases generally, whether in the legislative or adjudicatory context. ■ This division followed *Agins* in *Gilliland* v. *County of Los Angeles* (1981) 126 Cal.App.3d 610 [179 Cal.Rptr. 73], appeal dismissed (1982) 456 U.S. 967 [72 L.Ed.2d 840, 102 S.Ct. 2227], and now

holds again that monetary damages are not presently available to plaintiffs herein.

In the context of the case before us, we conclude that the Legislature contemplated mandamus or declaratory relief as the exclusive remedy for noncompliance with chapter 4.5 of the Government Code, and thus the alternative remedy for monetary damages is foreclosed to Developer. If a new trail is to be blazed in this area, it is more appropriately in the province of the Legislature rather than the courts.

### DISPOSITION

The judgment denying the petition for writ of mandate is reversed. The judgment dismissing the complaint for damages is affirmed. Each party to bear its own costs.

Lucas, J., and Aranda, J.,* concurred.

A petition for a rehearing was denied April 1, 1986, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied June 20, 1986. Bird, C. J., and Reynoso, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.