[No. H005501. Sixth Dist. May 3, 1990.]

NI ORSI et al., Plaintiffs and Appellants, v.
CITY COUNCIL OF THE CITY OF SALINAS, Defendant and
Respondent.

COUNSEL

Washburn, Briscoe & McCarthy, Jo Lynn Lambert, David Ivester, Finegan & Cling and Brian Finegan for Plaintiffs and Appellants.

Stephanie A. Atigh for Defendant and Respondent.

OPINION

**COTTLE, J.**—Plaintiff real estate developers sought a writ of mandate to compel the City Council of the City of Salinas (City) to issue them a planned unit development (PUD) permit. The trial court denied their petition.[1] On appeal, plaintiffs contend that the court erred in holding that their PUD permit was neither affirmatively approved by City on October 28, 1986, nor deemed approved by the mandatory provisions of the Permit Streamlining Act (the Act) (Gov. Code, § 65920 et seq.).[2] We conclude that the City did not approve or disapprove plaintiffs' project within the time limits set forth in the Act and that consequently the project was deemed approved by operation of law. We, therefore, reverse the judgment denying plaintiffs' petition.

FACTS

In 1979, City approved PUD permit 79-5 and tentative subdivision map 79-6 authorizing the development of 26.6 acres in northern Salinas. The plan called for development to occur in two phases, with a total of two hundred forty-eight units to be built. In 1980 City approved a final map for the first phase of the project (dealing with the westerly 17 acres of the tract). A total of 80 apartments, 10 duplexes and 68 single-family residences were built in the first phase. The original developers, however, never proceeded

---

[1] On an issue not relevant to this appeal, i.e., whether City gave plaintiffs sufficient notice of the February 25, 1987, hearing at which time City denied approval of the project, the court issued a peremptory writ commanding City to set a new hearing with proper notice. In all other respects, the trial court denied plaintiffs' petition.

[2] Unless otherwise specified, all statutory references are to the Government Code.

with the second phase of the project (dealing with the easterly 9.16 acres of the tract). No final map was ever processed, and the tentative map expired.

Plaintiffs purchased the undeveloped 9.16-acre tract and in December 1985 submitted a request to the City to amend the PUD permit so that they could build a 208-unit apartment complex on the tract instead of the 6 duplexes and 53 single-family residences authorized in the original PUD permit. Their request was denied.

Plaintiffs then began working on an alternative plan. They hired architect Robert Egan to design a lower density condominium project for the site which would provide a high degree of open space. On March 3, 1986, Egan met with the City's associate zoning administrator, Robert Richelieu, and other City officials to discuss the project and the City's general standards, including densities, for multifamily developments. The 9.16-acre parcel is designated in the City's general plan for medium density residential development (9 to 18 dwelling units per acre) and is zoned "unclassified" (U). According to Salinas City Code section 37-178, "Any use permitted in any district as provided herein may be permitted in a U district; provided, that a use permit therefor shall first be secured."

At the March 3d meeting, Richelieu incorrectly advised Egan that a City ordinance precluded developers from reapplying for a "similar" project for a one-year period from the time a prior application had been denied. The request to build the 208-unit apartment complex had been denied in January 1986. Richelieu observed in his notes of the meeting that he discussed: "Filing Status: 1 yr. limit for similar project. (?) Similar (?)" Richelieu then advised Egan of the steps necessary to go through the application process.

On May 27, 1986, Egan submitted two copies of an application for an amended PUD permit along with six copies of plans for the project and a check in the amount of $510. Within a few days, the City assigned the application the number 86-7, and it routed the plans to different City departments for their review. The number 86-7 was a designation given for actual applications for a PUD permit, not for requests for preliminary review. Requests for preliminary review were given a "PRE" number which did not indicate the year in which the application was received. On the route slips, the City was required to indicate whether the application was for a PUD permit, a conditional use permit, a variance, a preliminary review, an annexation, a tentative map, an owner participation agreement, a minor subdivision, or other. The City checked on each route slip that it was an application for a PUD permit.

On June 6, 1986, counsel for plaintiffs spoke to Richelieu's supervisor, Hardy Nielsen, who stated that there was no one-year waiting period for

this type of application and that the City would process the application. Plaintiffs testified that they considered the May 27, 1986, submittal to be an application for an amended permit. A check in the amount of $510, the amount required for an application for a PUD permit, was included. There is no fee charged for a predevelopment review.

On July 7, 1986, Richelieu returned the completed application and the $510 check to Egan in a letter in which he stated: "[W]e will be able to process your *application* to amend PUD 79-5. Your submitted *application* is however incomplete." (Italics added.) He enclosed a sheet itemizing the City's PUD submittal requirements (requiring 20 copies of the project's plans, not 6 as Egan had submitted) and added a handwritten note stating, "Robert, we are reviewing the plans submitted. I am returning your unsigned applications and check for resubmittal with a complete submittal. R.R."

Plaintiffs, their attorney, Egan, Richelieu, and Neilson, met again on August 7, 1986, to determine what additional information the City required. The City requested 20 sets of the plans rather than 6, some additional detail on landscaping, and that the applications be signed. A new application, identical to the May 27, 1986, application except for the fact that it was signed, was submitted on August 15, 1986.

In the meantime, City, on September 5, 1986, completed an initial study on the project to comply with the California Environmental Quality Act (CEQA), and concluded that the project would have no significant effect on the environment. A negative declaration was prepared, and public notice was given of the City's intent to adopt it at a public hearing before the Salinas Planning Commission on September 17, 1986.

On September 17, 1986, the planning commission considered plaintiffs' application for a PUD permit and determined that positive findings could not be made to support the project.[3] Consequently, it recommended to the city council that the application be denied.[4]

---

[3] Salinas City Code section 37-250 mandates the following findings in order to approve a proposed residential development: "(f) In order to approve a planned unit development permit, the commission shall find the following: [¶] (1) The proponents of the planned unit development have demonstrated that they are financially able to carry out the proposed project; [¶] (2) The proposed planned unit development conforms to the Salinas General Plan in terms of general location and general standards of development; [¶] (3) In the case of proposed residential developments: that such development will constitute a residential environment of sustained desirability and stability, that it will be in harmony with the character of the surrounding neighborhood and will result in an intensity of land utilization not substantially higher than, and standards of open spaces at least as high as permitted or specified otherwise for such development in this chapter; . . . [¶] (6) That the development of a harmoni-

Thereafter public notice was given that a hearing would be held before the Salinas City Council on October 28, 1986, to consider plaintiffs' requested amendment to PUD permit 79-5. The agenda for that meeting states that council was to consider PUD permit 86-7, "a request to amend Planned Unit Development Permit No. 79-5 and replace 53 single family and 6 two-family residences with a 178 unit multifamily complex," and that it was to take the following action: "a. Receive report from Associate Zoning Administrator [Richelieu]. [¶] b. Consider and approve Negative Declaration. [¶] c. Review findings of Planning Commission and consider approval of PUD permit."

The hearing was held on October 28th as scheduled, and the city council heard testimony from both supporters and opponents of the project. At the conclusion of the hearing, according to the official minutes of the meeting, "Councilmember Meurer moved to approve the Negative Declaration, approve the project with the additional landscaping requirements, and direct staff to prepare a Planned Unit Development Permit to be approved by the Planning Commission. Councilmember Grennan seconded the motion which was approved by a 4 to 1 vote. Councilmember Jeffries voted no."

Subsequently, the City drafted a PUD permit and submitted it to the planning commission on November 19, 1986. Prior to the meeting, Richelieu prepared a staff report stating: "The Planning Commission considered this application during their meeting of September 17, 1986. It was the Planning Commission's determination that positive findings could not be established to support the proposed amendment . . . . [¶] The City Council, however, during their meeting of October 28, 1986 determined that positive findings could be established . . . and directed staff to draft a Planned Unit Development for the Planning Commission's consideration." He stated that it was "staff's recommendation the Planning Commission . . . recommend its approval to the City Council." The planning commission, however, after conducting a full public hearing, decided to again recommend denying the amended PUD permit.

On December 4, 1986, plaintiffs submitted an application for approval of a tentative subdivision map.

On January 6, 1987, the draft-amended PUD permit was again considered by the city council. This time, the discussion focused on three environmental issues: sewage capacity in light of the City's December 8, 1986,

---

ous, integrated plan justified exceptions, if such are required, to the normal requirements of this chapter."

4 Section 37-250, subdivision (h) provides that the council "review the findings of the planning commission . . . and either issue or deny such planned unit development permit. . . ."

moratorium on sewer permits, traffic impacts, and substantial public controversy over the project. At that point, the council passed a motion requiring plaintiffs to prepare an environmental impact report (EIR).

The planning commission reviewed, considered, and recommended denial of plaintiffs' application for a subdivision map on January 21, 1987.

On February 23, 1987, a local newspaper quoted plaintiffs' attorney as stating that the City "either approved [the PUD permit] by their act in October, or it *has been* approved by operation of law . . . ." (Italics added.) The article went on to state that "[c]ity officials think [plaintiffs' attorney] is wrong." Although they believed the "six months [would] be up Thursday [February 26, 1987]," Richelieu indicated that by "asking for an environmental impact report, . . . the city gave itself six more months to act on the permit."

Nevertheless, the council called a special meeting on February 25, 1987, at which time it denied the PUD permit. Notice of the meeting had been left at plaintiffs' attorney's office with a receptionist at 4 p.m. on February 25. The attorney was out of the office at the time, and neither plaintiffs nor their attorney appeared at the meeting. Three weeks later, on March 17, 1987, the council denied the request for a tentative subdivision map.

On May 22, 1987, plaintiffs filed a petition in the superior court seeking a writ of ordinary mandamus, a writ of administrative mandamus, and declaratory relief. The hearing on the petition took place on December 3, 1987, at which time both oral and documentary evidence were presented in addition to the administrative record. The trial court issued its statement of decision on March 22, 1988. It found that the notice given to plaintiffs of the February 25, 1987, meeting was "not . . . 'reasonably calculated to afford affected persons the realistic opportunity to protect their interests.'" Consequently, "the court [found] that a writ should issue remanding the matter to the council with the instructions to set aside the action taken at the meeting held February 25, 1987, and to set a new hearing to consider its proposed actions, and to provide reasonable notice of that hearing and proposed action to petitioners." "In all other respects," however, the petition was denied. Final judgment was entered on January 6, 1989.

### The Permit Streamlining Act

The California Legislature, through the adoption in 1977 of the Permit Streamlining Act (§ 65920 et seq.), has found and declared "that there is a statewide need to ensure clear understanding of the specific requirements

which must be met in connection with the approval of development projects and to expedite decisions on such projects." (§ 65921.)

The Act defines "development," inter alia, as "change in the density of intensity of use of land, including, but not limited to, subdivision" (§ 65927), "development project" as "any project undertaken for purpose of development" (§ 65928), and "lead agency" as "the public agency which has the principal responsibility for carrying out or approving a project" (§ 65929).

The Act provides that within 30 calendar days of receiving an application, the lead agency must inform the applicant in writing whether the application is complete and accepted for filing. If incomplete, the lead agency must point out where the application is deficient and what additional information is needed. If complete, the lead agency proceeds with the application. If the lead agency fails to notify the applicant one way or the other, the application "shall be deemed complete for purposes of this chapter." (§ 65943.)

Section 65950 requires the lead agency to approve or disapprove the project within a specified time after the application is accepted as complete. If an environmental impact report is required, the time period is one year. If a negative declaration is adopted, however, the lead agency has just six months from the date the application is accepted as complete.

"In the event that a lead agency . . . fails to act to approve or to disapprove a development project within the time limits required by this article, such failure to act shall be deemed approval of the development project." (§ 65956, subd. (b).)

## DISCUSSION

On appeal, plaintiffs contend that their application was deemed complete on June 26, 1986, when City failed to object to its contents, and that their development project was approved by operation of law six months later, on December 26, 1986, by the City's failure to act within the prescribed time limits. We agree.

■ The first issue is whether the May 27, 1986, submittal was an application for an amended PUD permit or whether, as City argues, it was merely a request for preliminary review. In its statement of decision, the court found that City's argument that the "May 27th submittal was not an application for a development project, but rather a preliminary review of the project . . . does not withstand scrutiny. The July 7th letter refers to

the May 27th submittal as an 'application,' though an incomplete one. The routing papers from the City indicated they were treating it as an application for an amendment to PUD 79-5. The petitioners considered the May 27th submittal as an application and, in fact, the required check was enclosed. Thus, it appears that the parties were treating the May 27th submittal as an application for a development project." Substantial evidence, as set forth on pages 1579 to 1580 of this opinion, supports the finding of the trial court.

The City next argues that "[e]ven if the May application was considered a development application and was deemed complete on June [26], 1986, Appellants resubmitted a completed application on August 15, 1986. That resubmission," City contends, "triggered a new 30-day time period in which the City could determine the completeness of the application. [§ 65943, subd. (a).]" The trial court agreed with City that "the 30-day period referred in Government Code section 65943 began on August 15, 1986, not May 27, 1986" because (1) the May application was "defective" ("fourteen copies short and unsigned"), (2) petitioners were notified of the defects "only 11 days after the 30 day 'deemed complete' period expired," and (3) petitioners "resubmitted" the application rather than challenging the contents of the letter or arguing that the application was deemed complete. The court pointed out that section 65943 provides, in part, "Upon receipt of any resubmittal of the application, a new 30-day period shall begin, during which the public agency shall determine the completeness of the application." The court then found that "August 15th was the date of the application."

We cannot agree with the court's findings on this issue. Under the Act, the City had 30 days, and 30 days only, in which to notify the applicants that their application was "defective." The fact that the notice was only 11 days late is irrelevant.

The time limitations set forth in the Act create a mandatory duty on the part of the lead agency where, as here, the "thrust of the legislation was recognition that delay *can* constitute denial [and] time, accordingly, was the essence of the Statutory Scheme's provisions on development application procedures," and where "the penalty for noncompliance, i.e., the consequences, has been specified in the legislation itself." (*Palmer* v. *City of Ojai* (1986) 178 Cal.App.3d 280, 291, 293 [223 Cal.Rptr. 542], italics in original.)[5] In this case, as in *Palmer,* the projected use was consistent with the

---

[5] In *Selinger* v. *City Council* (1989) 216 Cal.App.3d 259 [264 Cal.Rptr. 499], the court, correctly in our view, questioned *Palmer*'s conclusion that the automatic approval provisions of the Act apply *even in* situations where neighboring property owners have been given no notice of or opportunity to be heard regarding the proposed development. In response to the

City's general plan (medium density residential development (9 to 18 dwelling units per acre) and zoning "unclassified" (U), permitting "Any use permitted in any district . . . provided, that a use permit therefor shall first be secured." Consequently, the City's failure to notify plaintiffs within 30 days that their application was incomplete resulted in the application being deemed complete.

We next address the issue of whether plaintiffs "resubmitted" their application within the meaning of section 65943, subdivision (a), thus triggering a new 30-day period. A review of the legislative history of this provision compels us to the conclusion that they did not.

Prior to 1984, section 65943 simply required the lead agency to notify the applicant within 30 days of whether the application was complete, and if not, what remained to be done. The statute went on to warn that the failure to do either would result in the application being deemed complete. The statute, however, failed to set forth guidelines regarding applications that were resubmitted after the lead agency made a finding that the original application was incomplete. Since the time limits begin to run only from the date a developer's application is accepted as complete, repeated requests for additional information by the lead agency could prolong the approval process that the Act was attempting to expedite. (See § 65921.)

To remedy the problem, the Legislature in 1984 added five new subdivisions to section 65943. These additions provide, in part: "Upon receipt of any resubmittal of the application, a new 30-day period shall begin, during which the public agency shall determine the completeness of the application. If the application is determined not to be complete, the agency's determination . . . shall includ[e] a list and thorough description of the specific information needed to complete the application. The applicant shall submit materials to the public agency in response to the list and description. [¶] (b) Not later than 30 calendar days after receipt of the submitted materials, the public agency shall determine in writing whether they are complete and shall immediately transmit that determination to the applicant. If the written determination is not made within that 30-day period, the application together with the submitted materials shall be deemed complete for purposes of this chapter. [¶] (c) If the application together with the submitted materials are determined not to be complete pursuant to subdivision (b), the public agency shall provide a process for the applicant to appeal . . . ."

_Palmer_ decision, the Legislature amended section 65956 (the deemed approval section) in 1987 to include a requirement of notice to the public and a hearing. Notice to neighboring landowners, however, is not an issue in this case. The administrative record indicates that seven public hearings were held on the project.

Read together, the amendments make it clear that the Legislature in discussing "resubmittals" was referring to applications that were resubmitted after the lead agency made a timely finding that the application as originally submitted was incomplete. The legislative history is in accord. "This amendment modifies the application process for development projects. Specified is that the 30-day period shall start over upon the resubmittal of an application held to have been incomplete." (Business, Transportation & Housing Agency, Supplemental Analysis of Assem. Bill No. 2622 (1984 Reg. Sess.), p. 1.) Additionally, "As passed by the Assembly, this bill: [¶] 1) Expanded the type of information public agencies must provide to applicants for development permits who submit incomplete applications. Specifically, the bill required public agencies to provide these applicants with a list and thorough description of specific information required to complete the application. [¶] 2) Required the public agency to notify the applicant in writing, within 30 days of receipt of additional material, whether or not the additional material was sufficient to make the application complete. [¶] 3) Specified that a local government appeal process must follow certain procedures." (State Assem. File Analysis, Assem. Office of Research Digest of Assem. Bill No. 2622, as amended June 21, 1984.)

We hold that plaintiffs' resubmittal of their original application on August 15, 1986, was not the type of resubmittal envisioned by the Legislature which would begin the running of a new 30-day period. Their May 27, 1986, application had already been deemed complete before the City requested the additional plans and signatures from them.[6] The fact that plaintiffs were cooperative with the City should not preclude them from the benefits that they had already obtained from the Act.

■ Under the Act, a development project which is neither approved nor denied by the lead agency will be deemed approved six months after it is accepted as complete if a negative declaration is adopted or one year after if an EIR is prepared. City contends that no negative declaration was adopted in this case because the city council did not have the actual PUD permit before it at the October 28, 1986 hearing. We find no merit in this argument. The official minutes of the meeting indicate that "Councilmember Meurer moved to approve the Negative Declaration. . . . Councilmember Grennan seconded the motion which was approved by a 4 to 1 vote. Councilmember Jeffries voted no."

---

[6] Section 65944, subdivision (a) permits a lead agency, after it has accepted an application as complete, to "request the applicant to clarify, amplify, correct, or otherwise supplement the information required for the application."

The CEQA guidelines[7] provide: "Any advisory body of a public agency making a recommendation to the decisionmaking body shall consider the proposed negative declaration before making its recommendation." (Guidelines, § 15074, subd. (a).) In this case, the planning commission, based on the initial study prepared by Robert Richelieu, recommended to the city council that the negative declaration be adopted. The guidelines continue: "*Prior to approving the project,* the decisionmaking body of the lead agency shall consider the proposed negative declaration together with any comments received during the public review process. The decisionmaking body shall approve the negative declaration if it finds on the basis of the initial study and any comments received that there is no substantial evidence that the project will have a significant effect on the environment." (Guidelines, § 15074, subd. (b), italics added.) Here, the city council considered the proposed negative declaration and conducted a full public hearing on the impact of the project. Richelieu stated at that public hearing, "I just want to make a note that if the Council is disposed to look favorably on this project, the motion should include consideration and approval of negative declaration." The CEQA guidelines contain no requirement that the decisionmaking body evaluate the environmental effects of a project *as described in a PUD permit*; rather, they simply require an analysis of the "project," "mean[ing] the whole of an action, which has a potential for resulting in a physical change in the environment . . . ."[8] (Guidelines, § 15378, subd. (a).) In this case the evidence establishes that a negative declaration was adopted by the City on October 28, 1986.

■ Having concluded that the May 27, 1986, submittal was an application that was deemed complete on June 26, 1986, and that a negative declaration was approved, then unless plaintiffs waived the mandatory time limits, their application was approved by operation of law on December 26, 1986. (See § 65957.) City contends that plaintiffs did waive time when they agreed to take their item off the council's December 9, 1986, calendar so that the status of the newly enacted sewer moratorium could be clarified. Plaintiffs, however, requested that their application be placed "on the next available Council agenda for consideration." The next available council meeting was on December 23, 1986, three days *before* the expiration of the six-month deemed approval period. Under no circumstances can this be construed as an agreement to extend the time limits set forth in the Permit Streamlining Act.

---

[7] All references to the CEQA guidelines are to California Code of Regulations, title 14, section 15000 et seq.

[8] In the Public Resources Code "project" is defined, inter alia, as: "Activities involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Pub. Resources Code, § 21065.)

When council failed to approve or disapprove plaintiffs' project by December 26, 1986, it was approved by operation of law. Subsequent acts of the City culminating in the eventual "denial" of plaintiffs' application were to no effect. In view of this holding, we need not reach the issue of whether the City expressly approved the project at its October 28, 1986, meeting. Additionally, since plaintiffs' PUD permit was approved by operation of law on December 26, 1986, it was therefore consistent with plaintiffs' tentative subdivision map which was automatically approved under the Subdivision Map Act (§ 66410 et seq.) on February 26, 1987. (§ 66452.4.)[9]

The judgment is reversed. Costs on appeal to appellant.

Premo, Acting P. J., and Elia, J., concurred.

A petition for a rehearing was denied May 31, 1990.

---

[9] Section 66452.4 provides: "If no action is taken upon a tentative map by an advisory agency which is authorized by local ordinance to approve, conditionally approve, or disapprove the tentative map or by the legislative body within the time limits specified in this chapter or any authorized extension thereof, the tentative map as filed, shall be deemed to be approved, insofar as it complies with other applicable requirements of this division and local ordinance, and it shall be the duty of the clerk of the legislative body to certify or state his or her approval." Here, the planning commission made its recommendation to the council on January 21, 1987, and the next meeting took place on January 27. Consequently, the last day on which council could act was February 26, 1987.