# United States Court of Appeals
# for the Federal Circuit

---

**OTAY MESA PROPERTY, L.P.,
RANCHO VISTA DEL MAR,
OTAY INTERNATIONAL, LLC,
OMC PROPERTY, LLC,
D & D LANDHOLDINGS, LP,
AND INTERNATIONAL INDUSTRIAL PARK, INC.,**
*Plaintiffs-Cross Appellants,*

v.

**UNITED STATES,**
*Defendant-Appellant.*

---

2011-5002, -5008

---

Appeals from the United States Court of Federal Claims in Case No. 06-CV-167, Judge Thomas C. Wheeler.

---

Decided: January 25, 2012

---

ROGER J. MARZULLA, Marzulla Law, LLC, of Washington, DC, argued for plaintiffs-cross appellants. With him on the brief was NANCIE G. MARZULLA.

JOHN E. ARBAB, Attorney, Appellate Section, Environment & Natural Resources Division, United States

Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief was IGNACIA S. MORENO, Assistant Attorney General.

_____

Before NEWMAN, SCHALL, and MOORE, *Circuit Judges*.

SCHALL, *Circuit Judge*.

The United States appeals the final decision of the United States Court of Federal Claims in *Otay Mesa Property, L.P. v. United States*, 93 Fed. Cl. 476 (2010) ("*Compensation Decision*"). In that decision, the court awarded plaintiffs $3,043,051, plus interest, for the temporary taking of a blanket easement over five parcels of land in the Otay Mesa area of San Diego County, California. For their part, plaintiffs cross-appeal the decision of the court which limited the government's liability to the taking of an easement over those five parcels and which limited the period of the taking to April of 1999 to October of 2008. *See Otay Mesa Prop., L.P. v. United States*, 86 Fed. Cl. 774, 790-91 (2009) ("*Liability Decision*"); *Compensation Decision* at 486-87. As far as the government's appeal is concerned, we hold that the Court of Federal Claims erred when it concluded that the government's taking of the easement was a temporary rather than a permanent physical taking. This error resulted in an erroneous calculation of plaintiffs' damages. As far as the plaintiffs' cross-appeal is concerned, we hold that the court did not err in limiting the government's liability. We therefore affirm-in-part, vacate-in-part, and remand the case to the Court of Federal Claims for further proceedings.

BACKGROUND

I

Plaintiffs Otay Mesa Property, L.P., Rancho Vista Del Mar, Otay International, LLC, OMC Property, LLC, D & D Landholdings, LP, and International Industrial Park, Inc. (collectively, "Otay Mesa") own eleven contiguous parcels of largely undeveloped land adjacent to the Mexican border in the Otay Mesa area of San Diego County. *Liability Decision* at 775. In 1992, Rancho Vista del Mar granted the United States Border Patrol a twenty-foot-wide easement along the Mexican border. The easement was for the purpose of enabling the Border Patrol to monitor and respond to illegal alien activity. *Id.* According to Otay Mesa, the Border Patrol dramatically increased its operations on Otay Mesa's property in the aftermath of the September 11, 2001 terrorist attacks. *Id.*

Otay Mesa filed suit in the Court of Federal Claims in 2006.[1] The suit alleged that the Border Patrol's activities of patrolling outside the boundaries of the easement, assuming stationary positions on Otay Mesa's land, creating new roads, constructing a permanent tented structure on Otay Mesa's land, and installing underground motion-detecting sensors constituted a "permanent and exclusive occupation" entitling the plaintiffs to just compensation under the Fifth Amendment's Takings Clause.[2] *Liability Decision* at 775 (citing *Boise Cascade*

---

[1] Ultimately, three separate suits were consolidated. *Liability Decision* at 776-77.

[2] In relevant part, the Fifth Amendment requires that the United States pay "just compensation" whenever it takes private property for public use. U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation.").

*Corp. v. United States*, 296 F.3d 1339, 1353 (Fed. Cir. 2002).

## II

After a trial on liability, the Court of Federal Claims ruled that, with the exception of the placement of the sensors, it lacked jurisdiction to consider Otay Mesa's claims. The court reasoned that "[i]f the Border Patrol's activity on [Otay Mesa's] property ever arose to a 'permanent and exclusive occupation,' it did so between 1996 and 1999." *Id.* at 788. The court held that because Otay Mesa did not file suit until 2006, its claims were barred by the six-year statute of limitations in 28 U.S.C. § 2501 (2006), *id.* at 786-90. *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133-34 (2008) (noting that the Supreme Court has "long interpreted" the statute of limitations for the Court of Federal Claims as setting forth a jurisdictional deadline). Otay Mesa has not appealed that ruling.

Otay Mesa's claim relating to the Border Patrol's use of underground sensors was not found to be time-barred because on August 28, 2008, the government filed a stipulation of partial liability directed to its placement of underground sensors on five of Otay Mesa's eleven parcels (Nos. 1, 3, 4, 5, and 10). *Liability Decision* at 777; Def.'s Stip., *Otay Mesa Prop., L.P. v. United States*, No. 06-CV-167 (Fed. Cl. Aug. 28, 2008, am. Oct. 16, 2008) ("Def.'s Stip.").[3] The stipulation acknowledged that the Border Patrol had installed fourteen "seismic intrusion sensors"

---

[3]  Although we follow the parties in referring to the government's concession of liability as a "stipulation," Otay Mesa did not participate in the drafting of the document and did not agree to its substance. Thus, it was more a "unilateral concession of liability" than a stipulation. *Compensation Decision* at 479 n.1.

at various underground locations on parcels 1, 3, 4, 5, and 10 between April of 1999 and November of 2005. *Liability Decision* at 777. The government stipulated that "by virtue of its placement of the 14 sensors . . . on the [five] parcels of land, it had taken a property interest in the nature of an easement over the parcel of land on which the sensors have been placed . . . ." *Id.* (quoting Def.'s Stip. ¶ 6). The stipulation described the easement as:

> A perpetual and assignable easement to locate, construct, operate, maintain and repair or replace the specified underground seismic intrusion sensors on the specified parcels, including the right to ingress and egress to each sensor location. The easement shall be deemed to have commenced on the date the sensor is listed as having been installed, and will continue until the sensor is no longer needed or the property is developed. Each sensor is and shall be located so as not to affect the functionality of the property. Should the landowner desire to develop any portion of the subject parcel, the sensor will be removed or redeployed upon 30 days written notice that a grading permit has been issued by the County of San Diego permitting development of all or a portion of the property. Upon removal of a sensor, the portion of the easement relating to that sensor shall terminate . . . .

*Liability Decision* at 777 (quoting Def.'s Stip. ¶ 7).

Based on the government's stipulation, the Court of Federal Claims held that the government was liable for the physical taking of an easement over the five parcels for the purpose of installing and operating the sensors. *Liability Decision* at 790-91. The court reserved the

determination of damages for a subsequent proceeding. *Id.* at 791.

Following a damages trial, the Court of Federal Claims concluded that Otay Mesa was entitled to just compensation of $3,043,051, plus interest, for the sensor easement. The court based this conclusion on its finding that the Border Patrol "possesses a temporary, non-exclusive, blanket easement to deploy seismic sensors" on the parcels identified in the stipulation. *Compensation Decision* at 479-80. The court reasoned that the taking was temporary because either party may terminate the easement, i.e., it terminates "upon the occurrence of one of two events: (1) when the sensor is removed because it is no longer needed [by the Border Patrol]; or (2) when [Otay Mesa] obtain[s] a grading permit from the County of San Diego permitting development of all or a portion of the property." *Id.* at 480, 488. The court determined the period of the easement to be from April of 1999 to October of 2008. *Id.* at 486. The court arrived at the April 1999 beginning date because that was when the first sensor identified in the stipulation was installed. The court selected October of 2008 as the ending date because that was the cut-off date used by Otay Mesa in presenting its damages evidence. *Id.* at 480, 481. The court ruled that the easement was "non-exclusive" because it found that the Border Patrol's use of the sensors placed no restriction on Otay Mesa's use of the property. *Id.* at 480. Finally, because the stipulation permitted the sensors to be placed anywhere on Otay Mesa's property and included the right of ingress and egress over the property, the court determined that the easement was a "blanket" easement over the entirety of the five parcels. *Id.* at 485-86.

Having found the easement to be temporary, the Court of Federal Claims calculated the amount of compensation to be awarded to Otay Mesa based upon the

"fair market rental value" of the property. *Id.* at 488-89. The court determined that value by averaging the monthly rental for a skydiving training lease ($25 per acre) and a parachute training lease ($58 per acre), which resulted in a rental of $41.50 per acre per month. *Id.* at 489. The court then applied this rate to each of the five parcels identified in the stipulation, which range in size from 89 acres (parcel 1) to 393.6 acres (parcel 3), beginning with the date the first sensor was installed on that parcel and ending with the October 2008 damages cut-off date employed by Otay Mesa, to arrive at a total damages amount of $3,043,051. *Id.* at 490.[4] The court rejected the government's contention that the easement was permanent and that therefore Otay Mesa's compensation should be calculated based upon the "before-and-after" compensation method, whereby a parcel is valued before and after an easement is imposed. *Id.* at 488-89.

The government's appeal and Otay Mesa's cross-appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

We review the Court of Federal Claims's legal conclusions de novo and its findings of fact for clear error. *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005).

On appeal, the government argues that the court erred in its damages award because it incorrectly ruled that the taking was temporary rather than permanent, which led the court to use the fair market rental value method of determining compensation rather than the

---

[4] The Court of Federal Claims provided a chart showing its damages calculation for each parcel. *Compensation Decision* at 490.

before-and-after method. According to the government, under the latter method, Otay Mesa is entitled to only a nominal award, given the court's finding that "the use of the sensors places no restriction on the functionality of the property to [Otay Mesa]." *Compensation Decision* at 479, 480. Otay Mesa cross-appeals the court's decision to limit the scope of the taking to the five parcels and the time period identified in the stipulation. We first address the government's appeal.

I

As seen, the Court of Federal Claims first considered whether the sensor easement was temporary or permanent. Then, having determined that issue, the court turned to the question of the amount of compensation owed to Otay Mesa. The parties do not dispute that this was the correct analytical approach, and we agree.

Although there has been some confusion over the use of the terms "temporary" and "permanent" in the takings context, *see Hendler v. United States*, 952 F.2d 1364, 1376-77 (Fed. Cir. 1991), it is clear that courts recognize both types of physical takings, *see e.g.*, *Kimball Laundry Co. v. United States*, 338 U.S. 1, 6-7 (1949) (temporary taking), and *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441 (1982) (permanent taking). It also is clear that courts use different methods to determine just compensation owed, depending on the temporal classification of a taking. *See Yuba Natural Res., Inc. v. United States*, 821 F.2d 638, 641 (Fed. Cir. 1987) (noting that this court has "recognized the distinction between temporary and permanent takings and the concurrent distinction between measures of compensation applicable to those two situations."). The duration of a physical taking pertains, not to the issue of whether a taking has occurred, but to the determination of just compensation.

*Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1582-83 (Fed. Cir. 1993) ("The limited duration of this taking is relevant to the issue of what compensation is just, and not the issue of whether a taking has occurred."); *Hendler*, 952 F.2d at 1376 (discussing *United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945), and noting that in that case "[t]he government's appropriation of the unexpired term of a warehouse lease was a taking; the fact that it was finite went to the determination of compensation rather than to the question of whether a taking had occurred"); *see United States v. Causby*, 328 U.S. 256, 268 (1946) ("Since on this record it is not clear whether the easement taken is a permanent or a temporary one, it would be premature for us to consider whether the amount of the award made by the Court of Claims was proper.").

Once a taking has been classified as either temporary or permanent, the court applies the appropriate method of determining just compensation. The usual measure of just compensation for a temporary taking is the fair rental value of the property for the period of the taking. *See, e.g.*, *Kimball Laundry*, 338 U.S. at 7 ("[T]he proper measure of compensation [in a temporary takings case] is the rental that probably could have been obtained . . . ."). In the case of a permanent taking, the owner is entitled to the fair market value of his property at the time of the taking. *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 474 (1973). Where the property interest permanently taken is an easement, the "conventional" method of valuation is the "before-and-after" method, i.e., "the difference between the value of the property before and after the Government's easement was imposed." *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 632 (1961). These methods are not exclusive; there may be appropriate alternative valuation

methods for the taking of an easement. *See Vaizburd v. United States*, 384 F.3d 1278, 1285-87 (Fed. Cir. 2004).

II

A

On appeal, the government argues that the Court of Federal Claims erred in holding that the sensor easement was temporary, rather than permanent. The government first points to its stipulation, which defines the easement as "perpetual" and which states that a sensor that is removed due to development of the property by Otay Mesa may be "redeployed" by the Border Patrol. *Liability Decision* at 777 (quoting Def.'s Stip. ¶ 7). Continuing, the government notes that the Court of Federal Claims reached its conclusion that the taking was temporary because, "[m]ost significantly, the Government's easement terminates upon the occurrence of one of two events: (1) when the sensor is removed because it is no longer needed [by the Border Patrol]; or (2) when [Otay Mesa] obtain[s] a grading permit from the County of San Diego permitting development of all or a portion of the property." *Compensation Decision* at 488. According to the government, this reasoning is flawed. The government argues that neither of the cited events is certain to occur because nothing suggests that illegal immigration over Otay Mesa's property is only a temporary problem, and because the Border Patrol reserves the right to redeploy sensors in different locations if Otay Mesa obtains a grading permit. The government contends that the stipulation thus describes a permanent easement.

In response, Otay Mesa argues that a taking that ends on occurrence of a specified event is temporary. In other words, the lack of a definite end date does not preclude the classification of a taking as "temporary." In making this argument, Otay Mesa relies on *First English*

*Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles*, 482 U.S. 304 (1987), *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002), *Bass Enters. Prod. Co. v. United States*, 133 F.3d 893 (Fed. Cir. 1998), and *Speir v. United States*, 485 F.2d 643 (1973). Otay Mesa contends that because the easement in this case will end when the Border Patrol removes the sensors because they are no longer needed or when Otay Mesa obtains a grading permit allowing development on its property, the Court of Federal Claims correctly held that the taking was temporary. Whether a taking is temporary or permanent is a question of law subject to de novo review. *Yuba*, 821 F.2d at 640.

B

We hold that the Border Patrol's blanket easement to install, maintain, and service sensors on Otay Mesa's property constituted a permanent physical taking. First, we do not believe that the cases upon which Otay Mesa relies support its argument that because the Border Patrol's easement will end upon the occurrence of either of two specified events, the taking was temporary.

Our predecessor court found the avigation easement in *Speir* to be temporary. In doing so, the court took into account the government's intention at the outset of the easement that the easement be temporary despite the fact that the government did not know at the outset when the easement might conclude. 485 F.2d at 647-48. Moreover, by the time the court decided the issue, the easement had terminated. *Id.* at 648. *Speir* is consistent with other temporary physical takings cases, in which the takings at issue usually have specific end dates by the time just compensation is awarded. *See, e.g.*, *Kimball Laundry*, 338 U.S. at 3, 7 (noting that the taken property was returned on March 23, 1946, and that "it was known from the

outset that this taking was to be temporary"); *United States v. Petty Motor Co.*, 327 U.S. 372, 374-75 (1946) (temporary taking concluding June 30, 1945); *General Motors*, 323 U.S. at 375-76 & n.3 ("The case now presented involves only the original taking for one year.").[5] *Speir* does not support Otay Mesa's argument. In this case, there is no indication that the Border Patrol intended that its easement be temporary. In addition, and most importantly, the easement has not terminated.

*First English*, *Tahoe-Sierra*, and *Bass Enterprises*, which involved regulatory takings, also do not support Otay Mesa's argument.[6] *First English* came to the Supreme Court from the California Court of Appeals. That court had held that a landowner who claimed that his

_____

[5] In the context of regulatory takings, we have stated that "[t]he essential element of a temporary taking is a finite start and end to the taking." *Wyatt v. United States*, 271 F.3d 1090, 1097 n.6 (Fed. Cir. 2001); *see Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1371 n.11 (Fed. Cir. 2004) (quoting *Wyatt*); *see also Yuba*, 821 F.2d at 641-42 (holding that a prohibition on mining activities that was withdrawn after six years was a temporary taking and rejecting the government's argument that because the taking was allegedly intended at the outset to be irreversible and for all time it was permanent).

[6] *See Tahoe Sierra*, 535 U.S. at 323-24 ("Th[e] long-standing distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a "regulatory taking," and vice versa. For the same reason that we do not ask whether a physical appropriation advances a substantial government interest or whether it deprives the owner of all economically valuable use, we do not apply our precedent from the physical takings context to regulatory takings claims." (footnote omitted)).

property had been "taken" by a land-use regulation prohibiting construction in a flood protection area could not recover damages for the period before it was finally determined that the regulation's prohibition resulted in a "taking" of his property. 482 U.S. at 306-07. In arriving at that holding, the Court of Appeal had relied upon *Agins v. Tiburon*, 598 P.2d 25 (Cal. 1979). In that case, the California Supreme Court decided that a landowner could not maintain an inverse condemnation suit in California courts based upon a regulatory taking, and instead could only sue for declaratory relief or a writ of mandamus. *Id.* at 29-31, *aff'd on other grounds*, 447 U.S. 255, 263 (1980). In *First English*, the Supreme Court addressed the merits of the *Agins* rule, 482 U.S. at 310, and thus the issue of whether "the Just Compensation Clause requires the government to pay for 'temporary' regulatory takings," *id.* at 313. The Court in *First English* did not address whether operation of the regulation at issue had resulted in a taking; instead it assumed that a taking had occurred for the purposes of its analysis. *Id.* at 311-13. The Court held that invalidation of an ordinance following a period during which the ordinance was in effect would have the effect of converting the taking at issue into a temporary taking but that such a conversion would not be "a sufficient remedy to meet the demands of the [Takings] Clause." *Id.* at 319-20. The Court thus decided that "on these facts the California courts have decided the compensation question inconsistently with the requirement of the Fifth Amendment." *Id.* at 311. "[A]ssum[ing] that the . . . ordinance has denied appellant all use of its property for a considerable period of years," the Court stated, the "invalidation of the ordinance without payment of fair value for the use of the property during this period would be a constitutionally insufficient remedy." *Id.* at 322. The Court therefore reversed the California Court of Appeal's holding that the landowner church

could not recover damages for the time before it was finally determined that the prohibition mandated by the land-use regulation constituted a taking. *Id.* at 306-07, 322. The Court stated that abandonment of a permanent taking creates a temporary taking, thereby affecting the compensation due. *Id.* at 318 (citing *United States v. Dow*, 357 U.S. 17, 26 (1958)). However, the Court did not hold or suggest that, in that case, prior to the abandonment, the taking would be classified as temporary.

In *Tahoe-Sierra*, the Court refused to adopt a bright-line rule that a temporary moratorium on development near Lake Tahoe was a per se taking. 535 U.S. at 342. In *Tahoe-Sierra*, the moratorium, and thus the alleged taking, pertained to a defined 32-month period of restriction that had concluded eighteen years prior to the Court's decision. *Id.* at 306. *Tahoe-Sierra* does not speak to the question of when a physical occupation is a temporary or permanent taking.

*Bass Enterprises* also does not support Otay Mesa's argument. In that case, the plaintiffs held a lease to drill on land that was condemned for storage of nuclear waste. 133 F.3d at 894. Congress had passed an act prohibiting all drilling through and under the condemned land, but had exempted the plaintiffs' lease from that prohibition unless the Environmental Protection Agency ("EPA") determined that the plaintiffs' pre-existing rights would need to be acquired. *Id.* The plaintiffs applied for drilling permits, but the Bureau of Land Management ("BLM") denied the permits for the time being, noting the EPA's present inability to assess whether it would be necessary to acquire the plaintiffs' lease. *Id.* Bass filed suit, alleging the permanent taking of portions of its lease, and the Court of Federal Claims held that the government had permanently taken the plaintiffs' property interest. *Id.* at 895. On appeal, the government argued that the taking

was temporary because, "at some definite point in the near future, the government will make a determination of whether to condemn Bass' lease." *Id.* The plaintiffs contended that the taking was permanent because the date at which the prohibition against drilling would end was speculative. *Id.* The court agreed with the government that the taking was not permanent, since the EPA was statutorily mandated to make a determination about the necessity of condemning the plaintiffs' lease. It therefore remanded the case to the Court of Federal Claims for further proceedings to determine whether the BLM's denial of the drilling permits constituted a temporary taking. *Id.* at 895-96. Addressing what it viewed to be the Court of Federal Claims's error in declining to find a temporary taking, the court noted that the cessation of a regulation's prohibition may be sufficient to establish a temporary taking but that it is not necessary for such a determination. Instead, "[t]he fact that regulation has not ceased may complicate a determination of just compensation but does not justify a bright-line rule against liability." *Id.* at 896. The court further noted that "[w]here an ultimate determination regarding Bass' lease is mandated by statute, the termination of the regulation process here is not as speculative as in other regulatory settings." *Id.* Thus, in *Bass*, the court based its conclusion that the taking at issue was not permanent on the fact that the EPA was statutorily mandated to come forward with a decision, thereby rendering "termination" of the drilling prohibition less speculative than the terminations of prohibitions in other regulatory cases. Putting aside the noted difference between regulatory and physical takings, in this case there is no potential termination of the sensor easement on the horizon that resembles the statutorily-mandated termination in *Bass*. If Otay Mesa does not develop the entirety of its property and the

government does not remove the sensors, the easement can and will continue "perpetual[ly]."

C

Second, "'permanent' does not necessarily mean forever, or anything like it." *Hendler*, 952 F.2d at 1376. Thus, the government has been held to have permanently taken property, despite the fact that "[a]ll takings are 'temporary,' in the sense that the government can always change its mind at a later time . . . ." *Id.*, *see, e.g.*; *Loretto*, 458 U.S. at 441. Further, the Supreme Court has defined a taking to be "permanent" even when specified action initiated by the landowner could terminate the taking. *See generally Loretto*, 458 U.S. 419. In *Loretto*, the Supreme Court rejected a challenge to the "permanent" status of a taking despite the fact that it was possible for the landowner to act in a manner so as to avoid the taking. Specifically, a New York law provided that a landlord was required to permit a cable television company to install its cable facilities upon his or her property. 458 U.S. at 421. In the context of the New York law, the Court held that a cable installation on portions of a landowner's roof and the side of her building was a permanent taking, reversing the decision of the New York Court of Appeals to the contrary. *Id.* at 441. In reaching its decision, the Court noted that a landlord could avoid the law's requirements by ceasing to rent the building to tenants, but that this did not make the cable company's invasion of the property not permanent. *Id.* at 438-39 & n.17 ("Insofar as Teleprompter means to suggest that this is not a permanent physical invasion, we must differ. So long as the property remains residential and a CATV company wishes to retain the installation, the landlord must permit it."); *see id.* at 448-49 (Blackmun, J., dissenting).

Thus, we disagree with the Court of Federal Claims and Otay Mesa that the parties' respective abilities to terminate the sensor easement in this case renders the taking temporary. Just as the landowner in *Loretto* could have terminated the taking by discontinuing use of the property as a residential rental facility, so Otay Mesa could decide to develop the entirety of its property, thereby terminating the sensor easement. Further, read in its entirety, we agree that the stipulation defines a "perpetual" easement that reserves in the government the right to "redeploy" the sensors in the case of Otay Mesa's development of the property.

We also disagree with the Court of Federal Claims's use of October 2008 as an arbitrary end-date for the damages calculation as indicative of the temporary nature of the Border Patrol's easement. *See Compensation Decision* at 480, 486-87. The problem with the court's approach is that the October 2008 date bears no relation to any activities of either the Border Patrol or Otay Mesa relating to the easement period. It is only such activities—abandonment of the easement by the Border Patrol or development of the property by Otay Mesa—that can end the easement.

Having held that the Court of Federal Claims erred in ruling that the sensor easement constituted a temporary taking, we remand to the court for a redetermination of damages. On remand, the court should determine damages based upon the Border Patrol having taken a permanent blanket easement over Otay Mesa's property, as set forth in the stipulation. In that regard, we offer the following:

The government has argued that, because the sensor easement is permanent, the compensation due Otay Mesa is much less than the compensation that would be due if

the easement were temporary. We find this argument difficult to accept. It does not seem to us logical that Otay Mesa should receive less compensation for the taking of a permanent easement than it would for the taking of a temporary easement. In our view, this case aptly demonstrates that "just compensation" should be carefully tailored to the circumstances of each particular case. *See Kimball Laundry*, 338 U.S. at 20 (explaining that "computation of the compensation due" should be consistent "with an approach which seeks with the aid of all relevant data to find an amount representing value to any normally situated owner or purchaser of the interests taken"). Compensation should be based on an assessment of precisely what the government takes from a landowner. *Gen. Motors*, 323 U.S. at 382. The landowner is entitled "to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more." *Olson v. United States*, 292 U.S. 246, 255 (1934).

We think that the Court of Federal Claims erred in its prior damages calculation in this case when it awarded compensation based upon the rental value of the property for skydiving and parachute training. The sensor easement clearly differs from a lease to use land for those purposes. By exclusively applying a rental value methodology and looking to rents paid for the use of land for skydiving and parachute training, the court, we believe, overlooked exactly what has been taken by the Border Patrol – a minimally invasive permanent easement to use undeveloped land that is unilaterally terminable by Otay Mesa. Under the easement, each sensor must be located so as not to affect the functionality of the property. In addition, should Otay Mesa wish to develop any portion of the property, any affected sensor will be removed or redeployed upon 30 days written notice that a grading

permit has been issued by the County of San Diego. Finally, upon removal of a sensor, the portion of the easement relating to that sensor terminates. In short, the court did not squarely address the just compensation appropriate to compensate Otay Mesa for the taking.

As noted, the government has argued before us that Otay Mesa's damages should be determined based upon a before-and-after methodology. While diminution in value is a useful methodology in many cases, we reiterate that the focus of the damages analysis must always remain on awarding just compensation for what has been taken. To award just compensation, a court must sometimes deviate from the traditional permanent taking-diminution in value and temporary taking-rental value approaches. *See, e.g.*, *Vaizburd*, 384 F.3d at 1286-87 (remanding for consideration of alternate methodology when there was no diminution in value).

The government acknowledges that "there can in principle be an appropriate alternative valuation measure to the 'before-and-after' method in a given takings case." Reply Br. 24. *See also Vaizburd*, 384 F.3d at 1283 (stating, in the circumstances of an easement, that "[a] comparison of the property's market value before and after a taking is *one appropriate method of valuation*") (emphasis added); *Compensation Decision* at 489 (noting that it was "afforded ample leeway in determining the fair market value of the [g]overnment's sensor easement") Thus, while the sensor easement is permanent, on remand the Court of Federal Claims will have discretion in identifying a methodology that fulfills the goal of awarding Otay Mesa just compensation. What is important is that the focus be on awarding just compensation for exactly what we have identified as having been taken in this case. We are confident that, after receiving the views of the parties, the court will be able to fashion an appropriate measure

of compensation for the Border Patrol's taking of a permanent easement over Otay Mesa's property.

## III

We turn now to Otay Mesa's cross-appeal. Otay Mesa argues that the Court of Federal Claims clearly erred when it limited the scope of the taking to the parcels and time period identified in the stipulation. Specifically, although the government stated in the stipulation that it placed fourteen sensors on five parcels of land between 1999 and 2005, Otay Mesa urges that the government's own witnesses testified that twenty-four sensors were placed on ten parcels of land, and that sensors had been on the property since the mid-1980s. Otay Mesa points to the testimony of Border Patrol Agent Michael Hance that the stipulation reflected only those sensors, and the dates of their installation, that were in place when the litigation commenced, but that in fact there had been sensors on the property going back to "approximately 1984, 1985" and on three to four additional parcels. Joint Appendix ("J.A.") 247-48, 249-50, 253. Agent Hance's testimony, Otay Mesa contends, is supported by that of two other Border Patrol agents, one of whom testified that he did not have reason to question Hance's testimony and that he had personal knowledge of sensor placement for the time period 1988-2000. J.A. 273. The other agent testified generally about the placement of sensors on additional parcels. J.A. 199.

The government contends that we should review this aspect of the Court of Federal Claims's decision for an abuse of discretion, since Otay Mesa previously had requested reconsideration of the scope of the *Liability Decision*, which the court denied in the *Compensation*

*Decision. See Compensation Decision* at 487.[7]  The government also argues that we should disregard certain testimony Otay Mesa cites on appeal because it was not cited to the court when, according to the government, Otay Mesa sought reconsideration of the *Liability Decision*.  The government responds to Otay Mesa's substantive arguments by pointing to what it characterizes as the imprecise nature of Agent Hance's testimony, and by arguing that little corroborative value should be given to the testimony of the other two agents.

Because we conclude that the Court of Federal Claims did not clearly err when it limited the scope of the taking to the parcels and time period identified in the stipulation, we need not resolve the dispute over whether Otay Mesa sought reconsideration of the *Liability Decision* and whether the more restrictive "abuse of discretion" standard is applicable.  Further, although "this court does not 'review' that which was not presented to the [trial] court," *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997), even were we to consider all of the testimony Otay Mesa cites we do not believe Otay Mesa has demonstrated clear error.  Specifically, having reviewed the several agents' testimony, which we agree is imprecise and vague, we are not left with "the definite and firm conviction that a mistake has been committed." *See United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

CONCLUSION

For the foregoing reasons, we affirm-in-part and vacate-in-part the decision of the Court of Federal Claims.

---

[7]    Otay Mesa takes the position that the government is incorrect in stating that it sought reconsideration of the *Liability Decision*.

The case is remanded to the Court of Federal Claims for further proceedings consistent with this opinion.

### AFFIRMED-IN-PART, VACATED-IN-PART, and REMANDED

COSTS

Each party shall bear its own costs.